## UNITED STATES of America, Plaintiff–Appellee,

v.

## Kenzie HYLTON, Defendant–Appellant.

### No. 02–4664.

United States Court of Appeals, Fourth Circuit.

Nov. 19, 2003.

Argued: Sept. 26, 2003.

Decided: Nov. 19, 2003.

**ARGUED:** Kelli Colleen McTaggart, Assistant Federal Public Defender, Greenbelt, Maryland, for Appellant. Donna Carol Sanger, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BREIF:** James Wyda, Federal Public Defender, Denise Barrett, Assistant Federal Public Defender, Greenbelt, Maryland, for Appellant. Thomas M. DiBiagio, United States Attorney, Greenbelt, Maryland, for Appellee.

Before NIEMEYER, LUTTIG, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge LUTTIG and Judge DIANA GRIBBON MOTZ joined.

## OPINION

NIEMEYER, Circuit Judge:

Kenzie Hylton was convicted of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g), and sentenced to 210 months' imprisonment. On appeal he challenges his conviction, contending (1) that the firearm was seized pursuant to a warrantless search of his girlfriend's apartment where he was living, in violation of the Fourth Amendment; (2) that his later statement admitting possession of the firearm was obtained without the benefit of counsel at a time when his Sixth Amendment right to counsel had attached; and (3) that the district court's *Allen* charge to a deadlocked jury improperly coerced the jury to reach a verdict. For the reasons that follow, we affirm.

I

On April 23, 2001, following an argument between Kenzie Hylton and his girlfriend Hawanya Harper, Harper called the Prince George's County police for assistance, telling the police that Hylton was in her apartment with a gun and that he would not let her in. After police officers arrived, Harper told them that she and Hylton had had an argument and that Hylton had refused to let her into the apartment. She also told the officers that a gun was located "under the bed" or "under the mattress" in the bedroom that she and Hylton shared. Although Harper was the leaseholder of the apartment, she told officers that Hylton was a live-in boyfriend and the father of one of her children. She told the officers that two of her children were either in the apartment or at a neighbor's house. During her conversations with the officers, she also related how Hylton had raped her the previous week, using the gun to facilitate the rape.

The officers tried to call Hylton by telephone, but he refused to answer. They also determined through the police dispatcher that he was the subject of three outstanding minor traffic warrants for his arrest. After about 40 minutes, Hylton answered the telephone and surrendered to the police outside of the apartment, where he was placed under arrest on the three outstanding warrants.

The officers then entered the apartment and conducted a protective sweep to "secure it" and to retrieve the gun described by Harper. The officers found a loaded .38 caliber gun between the mattress and the box spring of the bed identified by Harper.

After processing Hylton's arrest under the warrants and learning that Hylton had been convicted previously of a felony, the officers filed a "statement of charges" in the District Court of Maryland for Prince George's County, charging Hylton with possession of a firearm by a convicted felon, in violation of Maryland Code, Article 27, § 445(d) (1996) (current version at Md. Code Ann., Pub. Safety § 5–133(c) (2003)). After Hylton appeared before a judicial officer, he was released.

Two days later, on April 25, 2001, Harper called the police again to relate that Hylton had made telephone calls in which he threatened to kill her. Prince George's County police officers again arrested Hylton, this time pursuant to a warrant issued for witness intimidation and harassment. After signing a form advising him of his *Miranda* rights, Hylton signed a written waiver of those rights, indicating that he wished to talk to police without a lawyer. During the ensuing interrogation, Hylton signed a statement that he had possessed the .38 caliber gun that had been seized from Harper's apartment two days earlier.

Hylton was indicted by a federal grand jury on May 14, 2001, charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). He responded, filing motions to suppress (1) the .38 caliber gun seized on April 23 from Harper's apartment and (2) the statement he gave two days later admitting possession of the gun. The district court denied both motions, and the case proceeded to trial. When the jury announced that they were unable to reach a unanimous decision, the court gave the jury an "*Allen* charge," requesting them to make another effort to reach a unanimous verdict so long as the verdict represented the conscientious judgment of each juror. After 15 minutes of additional deliberations, the jury returned a guilty verdict. The district court sentenced Hylton to 210 months' imprisonment.

This appeal followed.

## II

Hylton contends first that the district court erred in denying his motion to suppress the gun seized on April 23, 2001, pursuant to a search of the apartment in which he and Harper lived.

In ruling on the motion, the district court rejected the government's argument that Harper had consented to the search of her apartment:

I do not conclude that there was consent. There is no testimony that there was any express consent from Ms. Harper or even an attempt to get consent from her, nor do I find there circumstances analogous to those in which there can be implied consent. The call was I can't get into my apartment, not anything beyond that. I simply don't find this sufficient to indicate that Ms. Harper had impliedly consented to the entry.

The district court, however, agreed with the government's alternative arguments. The court concluded that the entry into

the apartment and seizure of the gun were proper in that (1) after Hylton's arrest, the officers were entitled to conduct a protective sweep of the apartment without a warrant, under *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), and (2) because the officers were confronted by exigent circumstances created by the presence of the gun and risk of danger to Harper and her children, they were entitled to conduct a warrantless search, *see Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

On appeal, Hylton contends that neither ground relied on by the court is supported by the circumstances in this case. He argues:

> It is undisputed that officers had no indication, let alone evidence, that anyone dangerous was hiding in the apartment after officers arrested Mr. Hylton outside his apartment. Nor did they have any indication that the children were in danger. Although the officers may have been permitted to enter the apartment to look for the children, they exceeded the scope of that warrantless search when the search continued after police determined that no one was in the apartment. The officers also exceeded the scope of a protective sweep when they searched the bed not for a person, but for a gun, and seized the gun although it was not in plain view.

The government contends that the district court did not err in denying the motion to suppress, and as additional grounds for affirmance, it continues to argue that "Harper gave implied consent to enter and recover the firearm by summoning police to her apartment and providing them with the precise location of the firearm."

Although we review the district court's finding of facts for clear error, we review whether those facts satisfy the constitutional standard *de novo*. *See United States v. Gwinn*, 219 F.3d 326, 331 (4th Cir.2000).

The Fourth Amendment protects "the people" against "unreasonable searches and seizures," U.S. Const. amend. IV, and even though reasonableness generally requires that searches or seizures be conducted pursuant to a warrant, a warrantless search may be reasonable if it falls within "one of the narrow and well-delineated exceptions to the warrant requirement." *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). One "well-recognized" exception is valid consent. *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir.2001) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Moreover, valid consent may be given by any one of the co-habitants of a premises, even though no other co-habitant has consented. This principle follows from the rationale that co-habitants have joint access or control for most purposes and therefore have the right to permit the inspection as their own right—each co-inhabitant has "assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

In this case, we assume for purposes of discussion that Hylton and Harper co-inhabited the apartment that Harper leased.* When Hylton stayed in the apartment, he shared the bedroom and bed with Harper. Accordingly, there can

---

* Harper testified, however, that the lease for the apartment was in her name. She also testified that because this was "Section 8" housing, Hylton "wasn't supposed to be living there."

be no doubt that Harper had authority to consent to a search of both the apartment and the bedroom in which she slept. This factual circumstance is to be distinguished from a situation where one co-habitant has an exclusive and private area within the jointly occupied premises justifying the exclusion of others, such as a locked foot locker. *See United States v. Block*, 590 F.2d 535, 541 (4th Cir.1978).

▮ While Harper therefore had authority to give consent to a search of her apartment and bedroom, the district court found that Harper never gave the police *express* consent for such a search. The district court also concluded that the words and actions of Harper did not support the conclusion that she impliedly consented to the search of her apartment and bedroom. We disagree with this legal conclusion that the record does not show implied consent.

▮ Consent may be inferred from actions as well as words. *See, e.g., United States v. Wilson*, 895 F.2d 168, 170 (4th Cir.1990) (finding consent where defendant raised his arms after agent asked permission to pat him down); *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir.2000) ("The fact that there was no direct verbal exchange between [the officer and the third party] in which [the third party] explicitly said 'it's o.k. with me for you to search the apartment' is immaterial, as the events indicate her implicit consent"); *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.1981) ("[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct").

In this case, the circumstances and Harper's words lead to the inference that she gave consent to the police to search her apartment and thereby to enable her to return to the apartment in safety. And to this end it can be inferred that she authorized officers to retrieve the gun that had put her at risk. Harper called Prince George's County police for assistance following her dispute with Hylton, telling the officers that Hylton "would not let her in their apartment." More explicitly, she told officers that she "wanted to get into the house." Testifying about what she told police, Harper said,

> I told [the officers] my boyfriend was in the house. He wouldn't leave out. I was scared to go into the house, and I want to go in the house.

Harper also advised officers of the specific circumstances *inside* the apartment, telling them that there was a gun in the apartment that Hylton had used only a week earlier to facilitate raping her. She told them that her two children might be in the apartment. Finally, she told them specifically that the gun was located in the bedroom where she and Hylton slept— "under the bed," "under the mattress."

From these words and the circumstances that confronted the police, it could be inferred that Harper gave the police authority to enter Harper's apartment and retrieve the gun that caused her fear and apprehension. In the given circumstances, there would be virtually no other reason for her calling the police and giving them the details of what existed in the apartment. When a tenant is barred from entering her apartment and calls the police for assistance, it can be inferred that she is authorizing them to enter the apartment; when a tenant expresses fear about a dangerous condition in her apartment and calls the police for assistance, it can be inferred that she is authorizing them to diffuse the dangerous condition; and when a tenant calls police for assistance, stating that she is barred from her apartment, expressing fear about the presence of a gun, and describing precisely where the gun is located, it can be inferred that she is authorizing the police to enter the apart-

ment and retrieve the gun. Indeed, any tenant in these circumstances would rightfully be critical of police if they hesitated to assist her by diffusing a dangerous condition in her own apartment. She would rightfully have asserted, "This is my apartment; there is a man in my apartment who has a gun; and my children may be in there. Do something now."

In sum, we conclude that the undisputed facts in this case support the inference that Harper gave consent to the Prince George's County police to enter her apartment and to retrieve the firearm about which she complained. And because we have found implied consent, we need not address the alternative theories applied by the district court to justify the warrantless search, i.e., that the police were entitled to conduct a protective sweep and that their search was justified by exigent circumstances.

### III

■ Hylton next contends that his April 25 statement in which he admitted possession of the gun that was seized on April 23 was obtained in violation of his Sixth Amendment right to counsel and therefore should have been suppressed by the district court. Hylton argues that his right to counsel attached on April 23, when a statement of charges was filed against him in State district court, and that the waiver of his *Miranda* rights on April 25 during a police-initiated interview did not amount to a waiver of his right to counsel to assist him in all adversary judicial proceedings.

■ The Sixth Amendment right to counsel attaches at the initiation of "adversary judicial proceedings," *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)—at the first formal charging proceeding, *Moran v. Burbine,* 475 U.S. 412, 428, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)—after which the right applies at all critical stages of the criminal

proceedings, *United States v. Henry,* 447 U.S. 264, 269, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

In this case, "adversary judicial proceedings" for the prosecution of the felony offense of possession of a firearm by a convicted felon had not been initiated as of April 25 when Hylton gave his statement. Even though Hylton points to the statement of charges filed on April 23 to argue that such proceedings had indeed been initiated two days earlier, the statement of charges filed in the Maryland District Court on April 23 did not commence formal prosecutorial proceedings to which the Sixth Amendment right of counsel attached. *Cf. State v. Gee,* 298 Md. 565, 471 A.2d 712, 716 (1984) ("[W]hen the defendant cannot be tried under the warrant-statement of charges [because of a lack of jurisdiction] he is not held to answer a criminal charge on the basis of that document [and] [i]ts issuance does not mark the onset of formal prosecutorial proceedings to which the Sixth Amendment guarantee [of a speedy trial] is applicable"). Although Maryland law permits an offense to be tried in the Maryland District Court on a statement of charges, Md. Rule 4–201(b), the Maryland District Court does not have jurisdiction over felony charges, other than certain felonies not relevant to this case, *see* Md.Code Ann., Cts. & Jud. Proc. § 4–302(a). Hylton would have had to be tried in circuit court, but he could be tried in circuit court only on an indictment or information, not on a statement of charges. *See* Md. Rule 4–201(c).

Thus, on April 25, when Hylton gave a statement in which he admitted to possession of the gun, an adversary judicial proceeding against him had not yet been initiated. A grand jury did not indict Hylton for the charges of possession of a firearm by a convicted felon until a federal grand jury indicted him in this case on May 14,

2001. The district court thus properly denied Hylton's motion to suppress the statement.

## IV

 Finally, Hylton contends that the district court's *Allen* charge to the deadlocked jury was "coercive" because "it improperly and unduly emphasized the cost and expense of a retrial." We review a district court's decision to give an *Allen* charge and its content for abuse of discretion. *United States v. Burgos,* 55 F.3d 933, 935 (4th Cir.1995).

The traditional, "pure" *Allen* charge, based on *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), was an instruction to a deadlocked jury that addressed only jurors in the minority, asking them to consider whether the jurors in the majority were correct. To be less coercive with respect to jurors in the minority, we have "strongly recommended" that any *Allen* charge address all jurors, both in the minority and in the majority, "to give equal consideration to each other's views." *Burgos,* 55 F.3d at 937 (quoting *United States v. West,* 877 F.2d 281, 291 (4th Cir.1989)). Thus, the principal concern that we have had with *Allen* charges is to ensure that they apply pressure to the jury in a way that preserves all jurors' independent judgments and that they do so in a balanced manner.

Although we have indicated disfavor when a court giving an *Allen* charge focuses on the costs of a retrial, we have not considered this aspect unduly coercive if it is given in the context of an otherwise balanced charge. *See Burgos,* 55 F.3d at 938 n. 5; *West,* 877 F.2d at 291.

In this case, the district court's *Allen* charge was balanced, instructing both jurors in the minority and jurors in the majority that they "should seriously consider the arguments and the opinions of the juror or jurors on the other side."

The district court also instructed the jurors that "obviously it's desirable that a verdict be reached, but that verdict has to represent the conscientious judgment of each of you" and that "no juror should vote for a verdict unless that's a verdict that ultimately represents his or her conscientious judgment." Against this proper and balanced instruction, the district court also made a brief reference to the costs of a retrial. While disfavored, this addition was not in the overall context unduly coercive. And the fact that the jury reached a verdict shortly after the *Allen* charge was given does not indicate that it was.

Finding no reversible error, we affirm the judgment of the district court.

*AFFIRMED*