**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

No. 08-5036

─────────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

LAMONT A. TOYER,

        Defendant - Appellant.

─────────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, District Judge. (8:07-cr-00513-RWT-1)

─────────────

Argued: May 11, 2010        Decided: February 25, 2011

─────────────

Before WILKINSON and DAVIS, Circuit Judges, and C. Arlen BEAM, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

─────────────

Affirmed by unpublished per curiam opinion. Judge Davis wrote Parts I and II of the opinion, in which Judge Wilkinson and Senior Judge Beam joined. Judge Wilkinson wrote Parts III and IV of the opinion, in which Senior Judge Beam joined. Judge Davis wrote a separate opinion concurring in part and dissenting in part.

─────────────

**ARGUED:** Pat M. Woodward, Jr., Annapolis, Maryland, for Appellant. Mushtaq Zakir Gunja, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Robert K. Hur, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Lamont Toyer ("Toyer") entered a conditional guilty plea to knowingly and unlawfully possessing a firearm that had traveled in or affected interstate commerce after being convicted of one or more crimes punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). The indictment arose from events occurring at Toyer's residence, during which the police seized two handguns discovered after a warrantless search. Toyer raises two issues on appeal. First, he contends that the district court erred when it denied his motion to suppress the handguns found in his residence. Second, he contends that the district court erred in sentencing him to an enhanced sentence under the Armed Career Criminal Act.

I.

Shortly before midnight on June 5, 2007, Officers Christopher Adams ("Officer Adams") and William Weathers ("Officer Weathers") were dispatched to a house in Upper Marlboro, Maryland, to respond to a 911 call. Toyer lived at the residence with his sister Kimberly Ballard ("Ballard"). Officers Adams and Weathers were met at the door of the house by Ballard and her friend Kimberly Elliot ("Elliot"), who had also been staying at the house as a guest of Ballard's. Elliot had made the 911 call, telling the dispatcher that Toyer had

2

threatened to shoot her if she did not leave the house. She repeated that information to the officers when they arrived. Ballard and Elliot also told the officers that Toyer had been drinking alcohol, was possibly intoxicated, and that Toyer was in the basement of the house.

After speaking with the two women, the officers entered the house and, standing at the top of the basement stairs with their weapons unholstered, asked Toyer to come upstairs. Toyer replied that he would not come upstairs. A conversation between Toyer and the officers ensued for two to three minutes; eventually, Toyer came upstairs. The officers immediately handcuffed Toyer, placed him on the floor, and conducted a pat down search, but they did not find any weapons on Toyer. The officers asked Toyer if he had a gun, and Toyer replied that he did not. Elliot had previously told the officers that Toyer kept the weapon "downstairs" — possibly on a shelf — and so Officer Adams began a sweep of the basement area. When he did not find a weapon in the basement after searching the area twice, Officer Adams went back upstairs and advised the other officers that there was no weapon in the basement.

Another officer, who had just arrived on the scene, overheard Officer Adams and told him that Elliot had stated that the weapon might be in the drop ceiling of the basement. Officer Adams then returned to the basement a third time and

3

noticed that one of the tiles in the drop ceiling was ajar. He used a chair to boost himself up and, feeling around, pulled down two handguns. The guns were fully loaded with the safety in the "off" position and with rounds in the chambers. Toyer was formally arrested after the guns were found.

After the grand jury returned an indictment on November 7, 2007, charging Toyer with possession of a firearm in violation of 18 U.S.C. § 922(g), he filed a motion to suppress the firearms. The district court conducted an evidentiary hearing. After hearing testimony from the officers and Ballard, the district court denied Toyer's motion to suppress, finding that (1) there was valid consent for the search and, in the alternative, (2) the search was justified by the existence of exigent circumstances.

Toyer then entered into a plea agreement pursuant to which he pled guilty to violating 18 U.S.C. § 922(g). In the Pre-Sentence Investigation Report ("PSR"), the probation officer assigned Toyer 11 criminal history points, which established a criminal history category of V. The PSR, however, concluded that Toyer should be classified as an armed career criminal under 18 U.S.C. § 924(e) of the Armed Career Criminal Act ("ACCA"), resulting in a criminal history category of VI.

At sentencing, Toyer challenged his classification as an armed career criminal, arguing that his August 2004 conviction

4

in Maryland Circuit Court for second-degree assault was not an ACCA predicate offense. The district court disagreed, finding that the second-degree assault conviction was a "violent felony" under the ACCA. See 18 U.S.C. § 924(e)(1)(B). The court based its determination on the plea colloquy relating to that offense: while reciting the factual basis for Toyer's plea, the prosecutor stated that he would have proved that Toyer threatened his girlfriend with a handgun.

Accordingly, the court sentenced Toyer to 210 months of imprisonment, which was at the bottom of the applicable advisory guidelines range. Toyer filed a timely notice of appeal.

## II.

When a motion to suppress is denied, we review the evidence in the light most favorable to the government. United States v. Perkins, 363 F.3d 317, 320 (4th Cir. 2004). We review the factual findings underlying the ruling on the motion to suppress for clear error and the legal determinations de novo. United States v. Grossman, 400 F.3d 212, 216 (4th Cir. 2005).

On appeal, Toyer argues that Officer Adams's search for weapons exceeded the scope of any consent given and that the search did not fall under any other exception to the Fourth Amendment's warrant requirement. The district court, however, did not clearly err in finding that the officers had consent

from Ballard and Elliot to search the basement area for weapons, or that, in the alternative, exigent circumstances validated the warrantless search.

## A.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Fourth Amendment, therefore, protects against warrantless searches of homes. But "the Amendments are not rigid; they protect by insisting on judicial oversight, not by pressing inflexible rules," Mora v. City of Gaithersburg, 519 F.3d 216, 222 (4th Cir. 2008), and this general rule is "subject to certain exceptions," Brigham City v. Stuart, 547 U.S. 398 (2006).

We first consider Toyer's argument that the officers did not have consent to search his residence for weapons. Valid consent is a well-recognized exception to the Fourth Amendment's prohibition against warrantless searches. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Neely, 564 F.3d 346, 350 (4th Cir. 2009) (per curiam); Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001). The government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search. See United States v. Buckner,

6

473 F.3d 551, 554 (4th Cir. 2007); <u>United States v. Block</u>, 590 F.2d 535, 539 (4th Cir. 1978).

A consent must be (1) knowing and voluntary, and (2) given by one with authority to consent. <u>Buckner</u>, 473 F.3d at 554. There is no question in this case that any consent given by Ballard and Elliot was knowing and voluntary.[1] The analysis then turns to whether the person giving consent had apparent authority and whether the police officers exceeded the scope of the given consent.

A warrantless search can be justified by showing permission to search by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974). The defendant is not the only person with

---

[1] In her direct examination at the motions hearing, Ballard stated that although she authorized the officers to enter the house, she never consented to a search of the house:

> Q: Other than saying they could step inside the house, did you say that they could search the house?
>
> A: No. No, I did not.

J.A. 106. Nevertheless, the district court declined to credit Ballard's testimony in this regard, finding that the facts clearly showed that both Ballard and Elliot were "clearly upset and disturbed and wanted something done about [the situation]" and that Ballard's grand jury testimony indicated the same. J.A. 185. We have no occasion to question the district court's credibility determinations, and we therefore fully accept the court's finding that Ballard gave consent to search the house at the same time that Elliot also gave consent.

7

authority to consent to a search of his home or residence; authority arises from mutual use of the property by those with joint access or control. Trulock, 275 F.3d at 403. "Common authority" is not merely a question of property interest but requires evidence of "mutual use" by one generally having "joint access or control for most purposes." Matlock, 415 U.S. at 171 n.7. Such use makes it "reasonable to recognize that any of the co-[users] has the right to permit the inspection in h[er] own right and that the other have assumed the risk that one of their number might permit the common area to be searched." Id. In the context of a house, a co-habitant of the house may give valid consent to search even if other co-habitants have not given consent. United States v. Hylton, 349 F.3d 781, 785 (4th Cir. 2003).

A lack of actual authority, however, does not render consent invalid. The government may also show that a third party had apparent authority to consent to the search. Rodriguez, 497 U.S. at 188; see also Buckner, 473 F.3d at 555. An officer can reasonably believe that a third party has apparent authority to consent to a search if the facts available to the officer warrant a person of reasonable caution in the belief that the consenting party had authority. Rodriguez, 497 U.S. at 188. Evidence obtained by the police acting under a reasonable belief that a third party had authority to grant a

8

valid consent need not be suppressed.  <u>United States v. Kinney</u>, 953 F.2d 863, 866-67 (4th Cir. 1992).

Here, Ballard, who lived at the residence with her brother, the defendant, had authority to give consent to search the house, and it was also reasonable for the officers to believe that Elliot had authority to consent to the search of the house. Any officer responding to the 911 call at that residence would have faced circumstances where they could reasonably infer that both Ballard and Elliot had authority to give consent to search: when the officers arrived at the residence, both women met them outside the house and repeated to the police that Toyer had a gun, was in the house, and was in the basement where he regularly stored his guns.

Although Toyer argues that the officers exceeded the scope of any valid consent because Ballard and Elliot only gave permission to enter the house to search for him, and not for any weapons, his argument is not persuasive. The scope of consent for a search is "objective reasonableness," or rather, what a reasonable person would have understood from the exchange between the officer and consenting person. <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991). When an official search is properly consented to, the scope of the search is limited by the terms of the authorization. <u>Walter v. United States</u>, 447 U.S. 649, 656-57 (1980).

We have held that a consenting person need not even give explicit and express consent to search for a reasonable officer to understand that valid consent was given. See Hylton, 349 F.3d at 786 (holding that consent may be inferred from actions as well as words); United States v. Wilson, 895 F.2d 168, 170 (4th Cir. 1990) (finding consent where defendant raised his arm after agent asked him permission for a pat down search); see also United States v. Risner, 593 F.3d 692, 694 (7th Cir. 2010) (finding implied consent for police to enter and search home for defendant where consenting person had called 911, and also voluntarily told the police where the defendant was hiding in the house); United States v. Buetter-Janusch, 646 F.2d 759, 764 (2d Cir. 1981) ("[A] search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'").

We found, in Hylton, implicit consent to search the apartment in which the defendant and his girlfriend lived based on the circumstances and the girlfriend's words. 349 F.3d at 786. This court found that the girlfriend gave the police consent to search the apartment to enable her to return to the apartment safely, and that the officers reasonably inferred that she authorized them to retrieve the gun that had put her at risk. Id. We were also persuaded by the fact that the girlfriend had advised the officers of the specific

10

circumstances inside the apartment, concluding that "when a tenant calls police for assistance . . . expressing fear about the presence of a gun, and describing precisely where the gun is located, it can be inferred that she is authorizing the police to enter the apartment and retrieve the gun." Id. at 786-87.

The situation here — one of a domestic dispute involving threats of violence with a gun — is similar to the situation in Hylton, and even if Ballard and Elliot did not give express consent to search the house for weapons, the officers reasonably inferred that such implicit consent had been given. The government's burden is heavier where consent is not explicit, since consent is not lightly to be inferred. Neely, 564 F.3d at 350 (citing United States v. Impink, 728 F.2d 1228, 1232 (9th Cir. 1984)). But the government meets the burden in this case. In their testimony, both officers stated that Ballard and Elliot seemed concerned and scared that Toyer had threatened Elliot with a gun, and told the officers that Toyer was in the basement of the house with the weapon. Additionally, Elliot told Officer Adams that the gun was on a shelf, but then later told another officer that the gun may have been in the drop ceiling. Though she did not explicitly state "I consent for you to search the basement area for the gun," it is reasonable to believe that a rational officer would find her statements about the whereabouts of the gun to be consent to search for the gun. Furthermore, it

11

is reasonable for the officers responding to the frantic 911 call to believe that both Ballard and Elliot were giving consent for the officers to enter the house, search for Toyer and his weapon, and diffuse the potentially dangerous situation.

Although the officers made it clear to Ballard and Elliot after they had detained and secured Toyer that they were searching for the gun, even asking the two women if they knew where the gun was kept, neither woman withdrew her permission to search the house for the weapon. And while Toyer, who was a co-habitant of the house, could have expressly refused consent for the police to enter and search the house for weapons, he did no such thing even after he was detained and knew that the officers were continuing to search the basement for a weapon.[2] See

---

[2] There is some dispute as to whether Toyer explicitly told the officers that they did not have his consent to search the house, but the record persuasively convinces us that he did not. First, during his testimony at the motions hearing, Officer Adams was asked whether he had heard Toyer state at any point that they could not search his house without a warrant. Officer Adams replied that he had not. J.A. 120. Second, although Ballard testified that she heard her brother explicitly deny consent to search, the district court found that her testimony was not credible:

> I do not credit the testimony of the sister at all on the notion that he invoked his right to be free from unreasonable searches and seizures. My understanding from what I've heard and in this testimony is that he simply refused to come upstairs.

J.A. 182. Given the high standard and deference we give to a district court's factual finding, and given the testimony of the
(Continued)

12

<u>Georgia v. Randolph</u>, 547 U.S. 103, 123 (2006) (holding that where there was an express refusal of consent to search from a co-habitant, the consent of the fellow occupant is not valid). Therefore, it is clear that the officers had valid consent from Ballard and Elliot to search the house and all evidence found during that search was correctly admitted.

B.

Not only did the officers have valid consent to justify the warrantless search, but the search of Toyer's residence was also valid because of exigent circumstances.  It is well-established that even when an officer has probable cause to believe that contraband is present in a home, a warrantless search of the home is unlawful unless exigent circumstances exist at the time of entry.  <u>United States v. Mowatt</u>, 513 F.3d 395, 399 (4th Cir. 2008) (citing <u>Payton v. New York</u>, 445 U.S. 573, 589 (1980)). Exigent circumstances justify a warrantless search when an officer would have an objectively reasonable belief that an

_____

officers that they did not hear Toyer refuse consent to search the house, we cannot find that the district court committed a clear error in finding that Toyer stayed silent with respect to the search of the house.  <u>See also</u> <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996) (reviewing factual findings by "giving due weight to inferences drawn from those facts by resident judges and local law enforcement officers").

emergency existed that required immediate entry to render assistance or prevent harm. United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). The government bears the burden of demonstrating that exigent circumstances existed to overcome the presumption of unreasonable search and entry. See Mowatt, 513 F.3d at 399. Exigency is determined at the moment the search occurs. Id. Exigent circumstances exist in situations involving a "risk of danger to the police or to other persons inside or outside the dwelling," as well as in situations where officers have probable cause to believe that there is illegal activity present, where there is a compelling need for official action, and where there is no time to secure a warrant. United States v. Moses, 540 F.3d 263, 270 (4th Cir. 2008) (quoting Minnesota v. Olson, 495 U.S. 91, 100 (1990)); see also Michigan v. Tyler, 436 U.S. 499, 509 (1978). In ascertaining whether an officer acted reasonably in determining whether urgency existed, the court must look at the events and officer's knowledge immediately prior to commencing the search and apply an objective standard. Moses, 540 F.3d at 273; Hunsberger v. Wood, 570 F.3d 546, 554 (4th Cir. 2009).

We have articulated a nonexhuastive list of factors for the police to consider when determining whether exigent circumstances are present: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the

14

officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructability of the contraband." United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981).

We have no hesitation in concluding that exigent circumstances existed in this case. The record reflects that officers responded to a frantic 911 call about a man threatening an occupant of a residence with a firearm. Having gleaned the reason for responding to the 911 call, and after arriving at Toyer's residence and talking to Ballard and Elliot, any reasonable officer would have believed that urgent circumstances necessitated a warrantless search of the basement for a gun. In her 911 call, Elliot stated specifically that she was threatened by Toyer with a handgun, and this information was conveyed to the responding officers. After arriving at the house, both Ballard and Elliot confirmed and repeated that Toyer had a gun, was intoxicated, and had threatened to shoot Elliot. Both Officers Adams and Weathers understood that the urgency existed in not only finding and physically securing Toyer, but also in securing the handgun used in the threat. See Moses, 540 F.3d at 270 (finding exigent circumstances for a warrantless search where officers suspected a dangerous person in the dwelling);

15

Mowatt, 513 F.3d at 399 (finding exigent circumstances where the officers had a reasonable suspicion that the defendant had a weapon in his house).

Furthermore, the officers only searched the house for Toyer and his firearm — the person and item that posed the risk in this situation. At no time did they exceed the scope of their authority to search by looking around the house for other contraband. In fact, Officer Adams' search was constrained specifically to the basement, where Ballard and Elliot had told him that Toyer kept a gun, and he only looked in the places that Elliot had advised him that Toyer might have kept the gun — on the shelves and in the drop ceiling, but never in any drawers or other areas not in plain sight. The officers' actions further persuade us that they reasonably believed that the urgency and safety risks posed by this situation required them to secure both Toyer <u>and</u> his weapon. This was not a situation where "a search that is far more intrusive than necessary to accomplish its purpose may raise questions as to whether the proffered explanation for the search is the true one." <u>United States v. Johnson</u>, 410 F.3d 137, 146 (4th Cir. 2005) (adhering to the principle that warrantless entry for emergency reasons cannot be used as an excuse for discovery of other items not related to the purpose of the entry). Therefore, exigent circumstances necessitated the warrantless search of Toyer's residence not

only to secure him, but also the weapon he used to threaten other occupants of the house.

## III.

We turn now to Toyer's contention that the district court erred in sentencing him under the Armed Career Criminal Act ("ACCA"), which imposes a fifteen-year mandatory minimum sentence for any defendant who violates 18 U.S.C. § 922(g) and who has three prior convictions for "serious drug offense[s]" or "violent felon[ies]." 18 U.S.C. § 924(e)(1). Toyer concedes that he violated 18 U.S.C. § 922(g) and does not contest the district court's determination that his 1996 and 2002 convictions for possession with intent to distribute cocaine constitute "serious drug offense[s]" under the ACCA. See 18 U.S.C. § 924(e)(2)(A). Instead, Toyer argues that the third conviction used as an ACCA predicate – a 2004 conviction for second-degree assault in Maryland in violation of Md. Code. Ann., Crim. Law § 3-203 (the "Maryland conviction") – is invalid because the crime was not a "violent felony" under 18 U.S.C. § 924(e)(2)(B)(i).

### A.

In evaluating Toyer's argument, we keep several facts in mind. The first is that while the ACCA provides two specific

17

definitions of the term "violent felony," only one is at issue here. The government has not argued that the Maryland conviction is a violent felony under the so-called "otherwise clause" of the ACCA, which defines a violent felony as any crime that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). So we are confined to evaluating the district court's determination that the Maryland conviction qualifies as an ACCA predicate under what is known as the "force clause." See 18 U.S.C. § 924(e)(2)(B)(i). That provision states that a violent felony is any offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." Id.

The second fact we keep in mind involves the methodology of determining whether or not the Maryland conviction constitutes a "violent felony." The preferred approach for evaluating whether prior convictions qualify as "violent felonies" and thus as ACCA predicates is the categorical approach, under which we look only to the fact of conviction and the statutory elements of the offense. See Taylor v. United States, 495 U.S. 575, 600-02 (1990); United States v. Harcum, 587 F.3d 219, 222 (4th Cir. 2009) ("In assessing whether an offense constitutes an ACCA predicate offense, we must first utilize the categorical

18

approach. As we have recently explained, we are obliged, under that approach, to analyze the offense generically – that is, by relying solely on its essential elements, rather than on the particular underlying facts.") (internal quotations omitted).

In Johnson v. United States, 130 S. Ct. 1265 (2010), the Supreme Court held that in order for a crime categorically to be a violent felony under 18 U.S.C. § 924(e)(2)(B)(i), it must have the use of violent force as an element. See Johnson, 130 S. Ct. at 1271. Here, the government has conceded that Maryland second-degree assault does not include use of violent force as an element of the crime. That concession makes good sense; the statutory definition of Maryland second-degree assault is so broad that it is impossible to tell based on the elements alone whether or not a defendant "use[d] . . . physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i); see Harcum, 587 F.3d at 224 ("Maryland 'common-law assault is not per se a violent felony within the meaning of § 924(e)(2)(B)(i).'") (quoting United States v. Coleman, 158 F.3d 199, 204 (4th Cir. 1998)).

Accordingly, we must turn to the modified categorical approach set forth in Shepard v. United States, 544 U.S. 13, 26 (2005). See Harcum, 587 F.3d at 223 ("[W]hen the fact of conviction and the statutory definition of the offense are unduly vague or ambiguous, a sentencing court is entitled to

19

turn to and apply the alternative 'modified categorical' approach."). Under that approach, we may look to a circumscribed set of court documents to determine whether or not a prior conviction constitutes an ACCA predicate. In particular, we may consider "charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms," Johnson, 130 S. Ct. at 1273, in determining whether or not Toyer "necessarily admitted" facts amounting to a violent felony under the ACCA, Shepard, 544 U.S. at 24. With these principles in mind, we turn to whether the district court erred in determining that the Maryland conviction was an ACCA predicate.

B.

The only Shepard-approved document on record with respect to the Maryland conviction is the transcript of Toyer's plea colloquy in the Circuit Court of Maryland.[3] As a result, it is worth setting out the colloquy in some detail. Early on, while confirming that Toyer's plea was voluntary and free of coercion,

---

[3] The Government initially argued that the district court was allowed to consider the Maryland District Court's Statement of Probable Cause in determining whether the Maryland conviction (which occurred in Maryland Circuit Court) was an ACCA predicate. The government has abandoned that argument in light of our decision in Harcum. See Harcum, 587 F.3d at 224-25.

20

the judge asked Toyer whether he was actually guilty of second-degree assault.  Toyer agreed that he was:

> THE COURT:  You're pleading guilty because you are, in fact, guilty of a second degree assault?
> MR. TOYER:  Yes, sir.

After asking a few more questions designed to ensure Toyer's understanding of the proceedings, the judge asked the prosecutor to set forth the factual basis for the plea.  In response, the prosecutor described the basic facts of the case:

> Your Honor, had this matter proceeded to trial the State would show that on January 1, 2004 . . . the victim, Carmen Pickford, and her boyfriend, Lamont Toyer . . . . got into an argument over the fact that Ms. Pickford had allegedly seen another man while Mr. Toyer was unavailable.  The defendant, the victim called the police . . . and she told the police the defendant had pulled a handgun on her and threatened her with that handgun.
> When the police arrived they did search the area where Mr. Toyer was sitting and found a handgun underneath the seat of the cushion of the couch that he was sitting on.  The defendant made a statement to the police that his prints weren't on that particular weapon.  The gun actually was test fired and found to be operational.

The court then asked Toyer if he "agree[d] that's basically what happened," and Toyer's counsel responded as follows:

> MR. BEAU:  Your Honor, we'll agree that's the evidence they presented.  My client says I have no involvement with the gun involved.  I did have a fight with her and that's part of the reason that the case is being resolved this way.
> THE COURT:  All right, I'm going to accept the plea and enter a finding of guilty as to Count II.

21

If Toyer actually did threaten Pickford with a handgun, his crime would amount to a violent felony under the ACCA. A threat involving a handgun plainly constitutes the "threatened use of physical force against the person of another" within the meaning of 18 U.S.C. § 924(e)(2)(B)(i). After all, threatening someone with a handgun necessarily entails threatening them with "force capable of causing physical pain or injury to another person." Johnson, 130 S. Ct. 1271; see United States v. Cook, 26 F.3d 507, 509 (4th Cir. 1994) (using a handgun to threaten a state witness constitutes a violent felony under 18 U.S.C. § 924(e)(2)(B)(i)). By contrast, if the dispute between Toyer and Pickford was a purely verbal argument involving no threats of force, Toyer's crime would not qualify as an ACCA predicate. See 18 U.S.C. § 924(e)(2)(B)(i).

C.

Toyer contends that our decision in United States v. Alston, 611 F.3d 219 (4th Cir. 2010), forecloses us from concluding that he committed a violent felony based on his alleged threat with a handgun because his attorney disclaimed Toyer's "involvement with the gun involved."

1.

In Alston, we determined that a prior conviction for Maryland second-degree assault could not constitute a "violent felony" under the ACCA where the defendant entered an Alford plea. Alston, 611 F.3d at 220-21; see North Carolina v. Alford, 400 U.S. 25 (1970). As in this case, the court had to apply the modified categorical approach because Maryland second-degree assault was not categorically a violent felony. Id. at 223. Under Shepard, however, courts may only rely on facts "inherent in the conviction" or "admitted by the defendant" in determining the predicate status of a conviction. Id. at 226.

In Alston's case, the use of violent force was not inherent in his conviction. Nor was it admitted by the defendant; while the prosecutor's proffer during the plea colloquy suggested that Alston had "pointed a gun at three individuals and threatened to kill them," the fact that Alston entered into an Alford plea meant that he had "pleaded guilty without admitting these facts." Id. at 227. Indeed, in response to the proffer, Alston quite clearly stated, "I think it's in my best interests to take the deal rather than go to trial and run the risk I might get the maximum penalty. So I want the deal, but I don't want to say I did the crime." Id. at 223. Thus, because Alston had not admitted facts establishing that his crime was a "violent

23

felony," the court concluded that his Maryland second-degree assault conviction could not serve as an ACCA predicate.

Toyer argues we should reach the same result here because his attorney attempted to disavow Toyer's involvement with the handgun found at the scene. When the court asked if the prosecutor's proffer set forth "basically what happened," Toyer's attorney agreed that the proffer set forth "the evidence they presented," but went on to note that his client had "no involvement with the gun involved" and instead merely had a fight with the victim. Based on that statement, Toyer argues that his plea was the functional equivalent of an Alford plea with respect to his alleged use of a handgun. In other words, Toyer contends that the colloquy cannot serve as proof that Toyer committed a violent felony because Toyer refused to admit to the one fact that would support such a determination.

The principal difficulty with this argument, however, is quite simply that Toyer, unlike Alston, did not tender an Alford plea. Indeed, during the entire plea colloquy, Toyer neither disclaimed his guilt of second-degree assault nor voiced a desire to enter an Alford plea. To the contrary, Toyer expressly acknowledged his guilt immediately before the prosecutor's proffer:

> THE COURT: You're pleading guilty because you are, in fact, guilty of a second degree assault?
> MR. TOYER: Yes, sir.

24

(emphasis added).  Toyer's conduct at the plea colloquy was, in short, designed to do one thing – facilitate the court's approval of his guilty plea.  And for good reason – the plea allowed Toyer to cut his prison exposure by half.  Toyer's indictment charged him with one count of first-degree assault, one count of second-degree assault, and one count of use of a handgun in the commission of a crime of violence.  Second-degree assault was by far the least serious of these charges, carrying a maximum ten-year prison term in comparison with the twenty-five year maximum term for first-degree assault and the five-year mandatory minimum and twenty-year maximum term for the handgun charge.  See Md. Code. Ann., Crim. Law §§ 3-202 (first-degree assault), 3-203 (second-degree assault), 4-204 (use of handgun in commission of crime).

Given these circumstances, Toyer willingly admitted his guilt of second-degree assault to avoid prosecution on the other counts.  His conduct stands in stark contrast to that of Alston, who expressly refused to say that he "did the crime" before tendering a formal Alford plea.

Our distinguished colleague in dissent argues that this distinction does not matter – that it "will not do" to give "talismanic significance to the label 'Alford plea,'" see Dissenting Opinion at 34.  However, the distinction between

25

Alford and non-Alford pleas is indeed critical because the two categories differ in a number of salient ways. For example, in an Alford plea, the defendant maintains his innocence but pleads guilty because "his interests require entry of a guilty plea." Alford, 400 U.S. at 37. By contrast, in a traditional guilty plea, the defendant "admi[ts] that he committed the crime charged against him." Alford, 400 U.S. at 32. What is more, the prosecutor's proffer of the factual basis for the plea serves a fundamentally different purpose in each type of plea agreement. In an Alford plea, the prosecutor tenders a proffer to ensure the voluntariness of the plea. In the words of the Alford Court, the proffer "provide[s] a means by which the judge [can] test whether the plea [i]s being intelligently entered." See id. at 37-38. In a non-Alford plea, however, the proffer defines and frames the agreement, clarifying the nature of the offense to which the defendant has decided to plead.

It thus makes little sense to treat Alford and non-Alford pleas as fungible. That is especially true where, as here, a defendant seeks to carve out a subset of non-Alford pleas for special treatment. Alford pleas, like traditional guilty pleas, have a well-defined meaning and occupy a well-defined niche in the law of plea agreements: an Alford plea serves as a formal expression of disagreement with the factual basis for one's plea agreement. See Alston, 611 F.3d at 226. "Quasi-Alford" or

26

"faux-Alford" pleas, by contrast, stand on much shakier doctrinal footing, and we see no reason to fashion such a category from whole cloth.

As a result, we cannot agree with our colleague's view that Alston is "binding." See Dissenting Opinion at 34, 35, 39. Alston never once suggested that its holding reached outside the context of formal Alford pleas. Because Toyer's offhanded disavowal of the prosecutor's proffer did not constitute an Alford plea, his case does not fall within Alston's ambit. In other words, Alston could not be more different, and it does not control the outcome here.

2.

The lack of an Alford plea is not the only difficulty with Toyer's argument. In Shepard, the Court determined that "any sentence under the ACCA" must "rest on a showing that a prior conviction 'necessarily' involved (and a prior plea necessarily admitted) facts" sufficient to establish ACCA-predicate status. Shepard, 544 U.S. at 24. Here, Toyer argues that he did not "necessarily admit[ ]" to having used a handgun in a threatening fashion, meaning that his conviction is not a violent felony. But Toyer's argument collapses on itself.

The prosecutor's proffer established that the dispute between Toyer and his girlfriend had two parts: a verbal

27

argument followed by Toyer's threatening use of a handgun. Under Maryland law, the verbal argument does not constitute second-degree assault; a purely verbal exchange devoid of threats would not involve the actual, attempted, or threatened use of "unlawful force." Kellum v. State, 162 A.2d 473, 176 (Md. 1960); see Cruz v. State, 963 A.2d 1184, 1188 n.3 (Md. 2009).[4] Indeed, as the district court recognized, and as Toyer does not dispute, "You can't commit an assault by arguing. The only way you can commit an assault is to put somebody in fear of an impending battery. In other words, a force being applied to your person."

As a result, the only possible factual basis for the Maryland conviction was the threat involving a handgun. Thus, only one of two results can possibly obtain. Either Toyer did "necessarily admit[ ]" to using a handgun, or he entered a plea without any factual basis. Under this latter scenario, Toyer's plea to second-degree assault would have been unlawful. With respect to Toyer, this result would likely have necessitated a

---

[4] In particular, Maryland's second-degree assault statute states that "[a] person may not commit an assault," Md. Code Ann., Crim. Law § 3-203, and the statute elsewhere defines the term "assault" to mean "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings," Md. Code Ann., Crim. Law § 3-201. Maryland case law, in turn, defines "battery" to require "unlawful force used against the person of another, no matter how slight," Kellum, 162 A.2d at 476.

trial and possible conviction on the other charges. By the same token, the judge would have acted improperly in accepting a plea without a factual basis. Indeed, had the judge been sitting in federal court, such conduct would amount to a clear violation of Federal Rule of Criminal Procedure 11(b)(3), which requires a judge entering a plea to "determine that there is a factual basis for the plea." Fed. R. Crim. P 11(b)(3). Even in state court, the judge's conduct might raise constitutional concerns. See, e.g., Willett v. Georgia, 608 F.2d 538, 540 (5th Cir. 1979) ("[W]e hold that, when a defendant pleads guilty while claiming his or her innocence, the court commits constitutional error in accepting the plea unless the plea is shown to have a factual basis.").[5]

---

[5] Our colleague in dissent argues that this point is a nonstarter insofar as "exactly the same thing can and must be said about the prosecutor's factual proffer in support of the Alford plea in Alston." See Dissenting Opinion at 36. But that analysis misses the mark. Alford declared that it was not unconstitutional for a court to accept "a plea containing a protestation of innocence" where the defendant "intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." Alford, 400 U.S. at 37. But Alford did nothing to disturb the hornbook principle that a non-Alford plea without a factual basis would be unconstitutional. See Willett, 608 F.2d at 540; see also Alford, 400 U.S. at 38 n.10 ("A criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the Court."). In other words, while defendants are free to enter Alford pleas, with all of their attendant formalities, see Zinkand v. Brown, 478 F.3d 634, 635-36 (4th Cir. 2007) (example of an Alford plea colloquy), they cannot obtain the benefit of Alford pleas by
(Continued)

Of course, Toyer did not assert that his plea agreement was illegal back in 2004, and he does not make any such assertion now. By all accounts, Toyer was satisfied with the outcome of the plea negotiations. There is a simple reason for this fact: the plea agreement was favorable to Toyer. At bottom, then, Toyer wants contradictory things from the Maryland conviction. On the one hand, he wants his second-degree assault plea to stand because it significantly reduced his potential prison exposure. On the other hand, he seeks to undermine the factual basis for that very conviction in order to bar a career criminal sentence under the ACCA. In other words, Toyer wants the benefits of an _Alford_ plea without having actually entered one. Toyer cannot have it both ways. Toyer knowingly pled guilty to the crime described by the prosecutor and "necessarily admitted" his use of a handgun, meaning that his offense is indeed a violent felony.[6]

---

acquiescing in non-_Alford_ arrangements of dubious constitutionality. Our colleague's analysis thus suffers from the same difficulty as earlier: the insistence that _Alford_ pleas and non-_Alford_ pleas must be treated alike.

[6] Even the statements Toyer's counsel made reinforce the conclusion that Toyer committed a violent felony. Those statements cannot be divorced from the fact that Toyer pled guilty to second-degree assault based on what his attorney described as a "fight" with Toyer's girlfriend that resulted in her calling the police. It would be quite a stretch of the imagination to conclude from the colloquy that Toyer's actions (Continued)

Finally, it is well to take a step back and examine the consequences of adopting Toyer's approach. Alston presents a clear and easy-to-administer rule given that parties and courts alike are and will continue to be well aware of how Alford pleas work. Toyer invites us to reject this approach and to create a new category of "quasi-Alford" plea agreements for ACCA purposes that is far less determinate. Such an approach would make the ACCA sentencing process even more abstruse than it already is and would inject yet another layer of uncertainty into an already complex process.

Moreover, the "quasi-Alford" plea would encourage gamesmanship at sentencing hearings. The temptation would no doubt be great for defense counsel to quibble about the evidence presented in a plea colloquy in order to tee up a contest to a possible future ACCA sentence. In such circumstances, even the slightest and most fleeting observation voiced during a plea colloquy would force reviewing courts to struggle with knotty questions about exactly how much uncertainty dooms a putative

did not involve the use or threatened use of violent force, see Johnson, 130 S. Ct. at 1271, and instead amounted to some benign form of assault like "kissing without consent, touching or tapping, jostling, and throwing water upon another," United States v. Kirksey, 138 F.3d 120, 125 (4th Cir. 1998) (quoting Epps v. State, 634 A.2d 20, 23 (Md. 1993)).

ACCA predicate, or worse, begin to parse plea colloquy transcripts for magic words. In short, sentencing hearings would turn into nothing less than forums for relitigating the defendant's earlier plea colloquies to a far greater extent than at present. This result is fundamentally at odds with Taylor and Shepard, which sought "to protect sentencing courts from becoming forums in which the prosecution and defense attempt to reproduce the defendant's earlier trial." United States v. Dean, 604 F.3d 169, 175 (4th Cir. 2010).

There is little need for us to encourage such uncertainties. Since 1970, a defendant who wishes to dispute the factual basis for his plea has had several options. He can seek to withdraw the plea. He can attempt to offer some kind of alternative factual basis. Or he can enter an Alford plea. If he avails himself of the last approach, Alston will prevent the resulting conviction from serving as an ACCA predicate. But when defendants like Toyer refuse each and every one of these options – either because they wish to acknowledge their guilt or because they seek a more favorable sentencing outcome – they necessarily fall outside Alston's borders.

32

IV.

Because Alston's challenges to the search of his residence and to his sentence are without merit, the judgment of the district court is hereby affirmed.

AFFIRMED

DAVIS, Circuit Judge, concurring in part and dissenting in part:

I concur in the panel's resolution of Toyer's Fourth Amendment claim, but I dissent from its resolution of his sentencing claim. If Alston is correctly decided, then this case is wrongly decided. If this case is correctly decided, then Alston most assuredly is incorrectly decided.

There is no more support for a "violent felony" determination in the sole Shepard-approved document available to the court in this case (i.e., the transcript of the guilty plea proceeding in which Toyer pled guilty to second-degree assault under Maryland law) than there is for a "violent felony" determination in the sole Shepard-approved document available to the court in Alston (i.e., the transcript of the guilty plea proceeding in which Alston pled guilty to second-degree assault under Maryland law). In each case, the defendant pled guilty. In each case, only the use of a gun by the defendant elevated the second-degree assault to a "violent felony" under the ACCA. In each case, the use of a gun was not "inherent" in the offense of conviction, thereby necessitating resort to the "modified categorical" approach to the ACCA determination. In each case, there is neither an admission by the defendant nor an adjudication by the court that the defendant used a gun to commit the assault.

How, then, does the majority manage to skirt the application of binding precedent in this case? It appears there are three reasons offered, which neither singly nor in the aggregate genuinely distinguishes this case from Alston.

A.

First, the majority would give talismanic significance to the label "Alford plea." But this will not do. If we had occasion to apply the Taylor/Shepard "categorical test," rather than the "modified categorical test" necessitated by the expansive elements of the Maryland second-degree assault offense, it is clear that an "Alford plea" would be treated exactly like a more traditional guilty plea for purposes of the ACCA. See United States v. Vinton, --- F.3d ---, ---, 2011 WL 31526, *8 (8th Cir. Jan. 6, 2011)(finding state court conviction for second degree burglary qualifies defendant for ACCA treatment notwithstanding that conviction was pursuant to an Alford plea, distinguishing Alston); see also Note, Admitting Guilt by Professing Innocence: When Sentence Enhancements Based on Alford Pleas are Unconstitutional, 63 Vand.L.Rev. 1755, 1758 n.16 (2010) ("An enhancement based simply on the fact of a prior conviction, even if that prior conviction was pursuant to an Alford plea, is constitutional . . . . [A]ll federal circuits

have, at least in some form, held that an <u>Alford</u> plea is functionally a guilty plea.").[1]

Thus, <u>Alston</u>'s binding holding rests not simply on the mere fact that Alston tendered an <u>Alford</u> plea in state court, but rather, as <u>Alston</u> makes perfectly clear, the fact that "Alston did not adopt or accept the facts proffered by the government." <u>United States v. Alston</u>, 611 F.3d 219, 223 (4th Cir. 2010) ("The transcript from Alston's plea hearing, however, revealed that Alston's conviction was based on an <u>Alford</u> plea <u>during which</u> <u>Alston did not adopt or accept the facts proffered by the</u> <u>government</u>." (emphasis added)).[2] As the majority forthrightly

---

[1] Accordingly, contrary to the majority's view of the matter, it is of no moment whatsoever that "Toyer willingly admitted his guilt of second-degree assault." Maj. Op. 25. Of course he did; the dispositive question under <u>Alston</u>, however, is whether the guilty plea transcript discloses that Toyer "admitted" he used a gun in committing second-degree assault. As the majority is required to acknowledge, not only did Toyer not admit any such thing, he (through counsel) <u>affirmatively denied</u> <u>the relevant fact</u>. If anything, the lack of an admission in this case is demonstrated even more strongly than in <u>Alston</u> because it is explicit, not buried in the vagaries of an <u>Alford</u> plea.

[2] Thus, the majority is wrong to state:

> Since 1970, a defendant who wishes to dispute the factual basis for his plea has had several options [, including the option of] an <u>Alford</u> plea . . . . If [he] avails himself of [an <u>Alford</u> plea], <u>Alston</u> will prevent the resulting convictions from serving as an ACCA predicate.

Maj. op. at 32 (alterations added). If a state court judge is willing, under an <u>Alford</u> rubric or otherwise, to accept a guilty plea from a defendant who denies the facts proffered by the
(Continued)

acknowledges in the case at bar, precisely the same thing is true here. For present purposes, "[t]he distinguishing feature of an _Alford_ plea is that the defendant does not confirm the factual basis for the plea." _United States v. Savage_, 542 F.3d 959, 962 (2d Cir. 2008). That feature virtually leaps from the pages of Toyer's plea proceeding transcript before us.

B.

Second, it appears the majority believes that Toyer must be deemed (for ACCA purposes) to have admitted using the gun to assault his girlfriend when he pled guilty because otherwise the state judge's acceptance of his guilty plea would have been constitutionally suspect. _See_ Maj. op. at 29 (citing _Willett v. Georgia_, 608 F.2d 538, 540 (5th Cir. 1979)). With respect, it is utterly beyond me how the majority cannot see that exactly the same thing can and must be said about the prosecutor's factual proffer in support of the _Alford_ plea in _Alston_, in which the conviction for second-degree assault under Maryland law rested

_____

prosecutor, as did the state court judge in Toyer's case, there is not a thing this or any federal court will be able to do about it. If, in such a circumstance, a subsequent federal court must apply the "modified categorical" approach to an ACCA determination, _Alston_ will dictate the result, exactly as it does here, regardless of whether the plea is labeled an _Alford_ plea.

37

solely on the fact that Alston had pointed a handgun at three people and threatened to "kill them all." See 611 F.3d at 223 ("[T]he prosecutor outlined the evidence she would have introduced at trial, which indicated that Alston had pointed a gun at three victims and stated that he would kill them all."). In both cases, if one excises from the factual basis recited to the state court in support of the guilty plea the defendant's use of a handgun, there is no crime.[3] The constitutional propriety of the underlying conviction, an issue not before us in any event, stands on equal footing in both cases. This purported ground of distinction does not withstand scrutiny.

---

[3] I note that at the government's urging, the majority has waded into an analysis of the apparent benefits Toyer enjoyed in entering into the plea agreement with the state. Consideration of such data has absolutely nothing whatsoever to do with the application of the modified categorical approach to the determination of the "violent felony" question under the ACCA.

In any event, the government's argument is unavailing. The government argues that by stating that his client did not accept the state's proffer about the gun, Toyer's counsel "was attempting to ensure that his client's conviction was for second-degree assault, rather than for first-degree assault or use of a handgun in the commission of a crime of violence." Supp. Br. at 9. There is nothing in the record to support this contention. To the contrary, at the beginning of the state court proceeding, it was made clear that Toyer was pleading guilty to second-degree assault. J.A. 249 (Toyer's attorney stating "this is second degree assault"); J.A. 250 (judge confirming the plea was for "second degree assault"). There is no merit in this speculation on the part of the government.

## C.

Finally, the majority seems to believe that by ignoring the binding holding of <u>Alston</u>, it achieves a level of "certainty" that will create a form of "bright line rule" beneficial to the law of this circuit. Respectfully, I disagree. Certainty is achieved when this court is faithful to its precedents. To the extent that the majority contemplates the existence of some neat taxonomy of punishment-justifying pleas in state courts, i.e., "guilty," "no contest" and <u>Alford</u>, my friends in the majority need only examine the chaotic state of the law and practice described in <u>Bishop v. State</u>, 7 A.3d 1074 (Md. 2010) (discussing so-called "hybrid pleas" recognized under Maryland law).

\* \* \* \*

In sum, while the state court in Toyer's second-degree assault case did not accept an <u>Alford</u> plea, Toyer's guilty plea produced the jurisprudential equivalent for ACCA purposes because Toyer's counsel explicitly stated on Toyer's behalf that Toyer had "no involvement with the gun." While an <u>Alford</u> plea has specific legal meaning, "[u]ltimately, context determines meaning, and we do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense." <u>Johnson v. United States</u>, 130 S. Ct. 1265. 1270 (2010) (citations omitted). Here, in context, <u>Alston</u> relies entirely on the fact that the defendant never admitted to the material facts

required by Supreme Court precedent to qualify the conviction for ACCA treatment. To ignore the rationale and holding supporting the result in Alston and choosing instead to apply them only to situations where a defendant formally enters an Alford plea produces illogical and inconsistent results plainly at odds with binding precedent.

With respect, I am constrained to the view that the majority's enterprise fits the description it assigns to Toyer's argument: it "collapses on itself." Maj. op. 27. I would affirm the conviction, vacate the sentence, and remand the case for resentencing without regard to the ACCA.