FILED
United States Court of Appeals
Tenth Circuit

April 13, 2011

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENNTH CIRCUIT

---

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

DARRON L. ESKRIDGE,

  Defendant-Appellant.

No. 09-3343

(D.C. No. 2:08-CR-20153-KHV-01)
(D. Kan.)

---

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

JOHN T. ROLAND, JR.,

  Defendant-Appellant.

No. 09-3362

(D.C. No. 2:08-CR-20153-KHV-02)
(D. Kan.)

---

ORDER AND JUDGMENT[*]

---

Before **HOLMES** and **BALDOCK**, Circuit Judges, and **JOHNSON**[**], District Judge.

---

Appellant Darron L. Eskridge ("Eskridge") was convicted after jury trial of

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] The Honorable William P. Johnson, United States District Judge for the District of New Mexico, sitting by designation.

felon in possession of a firearm and Appellant John T. Roland, Jr. ("Roland") pled guilty to the same charge. Eskridge and Roland both appeal the district court's denial of their motions to suppress based on a traffic stop by the police of the vehicle in which they were the two occupants. They argue the traffic stop was initiated in violation of their Fourth Amendment rights. Eskridge also challenges the district court's denial of his motion for acquittal on the basis of insufficient evidence to support his conviction, and Roland challenges the district court's calculation of his sentence based on a relevant conduct enhancement and the determination that his prior felony conviction was a "crime of violence." Although Eskridge and Roland filed appeals that were briefed and argued separately, we consolidate the appeals because of the identical factual and legal issues surrounding the traffic stop. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I.    Background

On September 22, 2009 at approximately 10:00 a.m., Captain William Howard of the Kansas City, Kansas police department was heading home from the police station to take an early lunch. He was in uniform and driving an unmarked white Ford Crown Victoria. Captain Howard had sixteen years of experience as a law enforcement officer and drove this route daily.

While heading northbound on Hutton Road in Kansas City, Kansas, he noticed a black SUV with Missouri plates pulled over on the side of the road at an unusual spot—part way into a ditch. Captain Howard, in all his years traveling that road, had

2

never seen a vehicle parked in that manner at that location. He slowed his speed as he approached the vehicle and noticed a man outside the SUV facing the rear passenger door which was opened. The man was ducked into his car, concealed from the waist up, and he was "moving very rapidly and working feverishly." R. Vol. 2 at 20-21.[1] Captain Howard thought the man might be assaulting someone in the vehicle, restraining someone, or spanking a child. He slowed his speed as the Crown Victoria passed the SUV, and Captain Howard expected the man to flag him down for help or wave at him to indicate that the situation was under control. Instead, the man glanced up at the passing car with a deer-in-the-headlights look as though alarmed to see Captain Howard. R. Vol. 2 at 26.

Captain Howard did not stop his vehicle at that point but continued northbound on Hutton Road until the next major intersection. He made a U-turn and traveled back to the spot he had seen the SUV. At first, he could not see the vehicle anywhere on the road. As he got closer to the spot, he realized that the vehicle had backed into a gravel driveway, deep enough to be hidden behind the trees. The SUV had turned around and was exiting onto Hutton Road. The driver displayed uncertainty about which way to turn, but ultimately took a left out of the driveway southbound onto Hutton Road, right in front of Captain Howard's car. Captain Howard found this to be an odd decision, as the vehicle had originally been headed north. He decided to

---

[1] Citations to the record are to *United States v. Roland*, No. 09-3362 (10th Cir. filed Dec. 16, 2009).

stop the vehicle and inquire into the strange behavior he had observed.

He activated his emergency lights and the car pulled over in response. There were two males inside: the driver, Eskridge, and the passenger, Roland. Captain Howard asked the driver what he had been doing parked on the side of the road, and Eskridge responded that he had been wiping crumbs off of the backseat. While speaking with the driver, Captain Howard noticed various household electronic devices, including a DVD player, stacked in the backseat and on the front passenger floorboard, under the feet of the passenger, Roland. Eskridge explained that the items were his, which he had with him because he had left his girlfriend's house after a fight. Captain Howard did not believe Eskridge's story about crumbs or owning all the items in the SUV. He obtained the girlfriend's phone number from Eskridge and called her. She confirmed that she did have a fight with Eskridge, but said that he had not taken any household items with him when he left her house.

Another officer, Sgt. George Simms, arrived at the scene while Captain Howard was on the phone. Sgt. Simms observed a handgun on the floorboard of the driver's side of the vehicle. Dispatch had informed the officers that Eskridge had a prior felony conviction for burglary, so Sgt. Simms placed Eskridge under arrest for possessing the firearm. Eskridge explained that it was just a pellet gun and pellets would be found in the backseat. Captain Howard asked for permission to search the car for the pellets, and Eskridge consented. Captain Howard recovered several items, including a box and paperwork all bearing a name that did not match Eskridge's or

4

Roland's, and on further investigation the police matched that name to a local address. Officers went to the address and determined that the residence had been burglarized. Items reported missing from that residence matched many of the items Captain Howard had found in the SUV.

Captain Howard then performed a search of the area along Hutton Road and found scattered items that had been thrown into the ditch on the side of the road where the SUV had originally been parked. The residents of the burglarized home arrived and identified their property in the ditch and the backseat of the SUV. A report of three missing firearms from the residence prompted Captain Howard to return with several other officers to search the area around the gravel drive which Captain Howard had observed the SUV exiting. They found two of the three reported missing firearms. A subsequent search, which included dredging a nearby pond, failed to uncover the third firearm.

Eskridge and Roland were each charged with felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2) in an indictment returned on November 5, 2008. On March 9, 2009, both defendants filed motions to suppress based on the traffic stop which they argued was initiated illegally. An evidentiary hearing was held on the motions on April 1 and 2, 2009. The district court denied the motions in an order issued April 14, 2009. Roland pled guilty on June 10, 2009, preserving his right to challenge the district court's denial of his suppression motion and the calculation of his sentence. Eskridge's case proceeded to jury trial and he

5

was found guilty on August 27, 2009. Eskridge was sentenced to 327 months' imprisonment on December 2, 2009[2] and Roland was sentenced to 100 months on December 9, 2009.

## II. Discussion

### A. Legality of the Stop

Eskridge and Roland challenge the validity of the initial traffic stop, arguing that it was not justified at its inception because Captain Howard admittedly did not observe a traffic violation. Eskridge also challenges the scope of the traffic stop, arguing there was no valid consent or reasonable suspicion to justify continuing the encounter once Eskridge, the driver, presented a valid license and registration. The United States argues that reasonable suspicion existed throughout the encounter because of the suspicious behavior observed by Captain Howard. As an initial matter, we find that Eskridge's challenge to the scope of the detention is waived because it was not properly presented to the district court. *See* R. Vol. 1 at 23-25 (motion to suppress by Eskridge presenting argument only relating to initial stop). Therefore, we concentrate only on the validity of the initial stop.

We review de novo the district court's denial of the motion to suppress evidence, but we "view the evidence in the light most favorable to the district court's determination." *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001). A

---

[2] Eskridge raised no challenge to the 327 month sentence imposed by the district court.

6

routine traffic stop is a seizure within the meaning of the Fourth Amendment, but it need not be supported by a full showing of probable cause. A police officer may initiate a traffic stop on the basis of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "Reasonable suspicion arises when 'an officer of reasonable caution' has a 'particularized and objective basis for suspecting the person stopped of criminal activity . . . .'" *United States v. Pena-Montes*, 589 F.3d 1048, 1052 (10th Cir. 2009) (quoting *United States v. Winder*, 557 F.3d 1129, 1133-34 (10th Cir. 2009)). The officer's actions must be "judged against the totality of the circumstances," and the officer's "subjective motivations are irrelevant to [the] inquiry." *Id.*

"[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion . . . ." *United States v. Cortez*, 449 U.S. 411, 419 (1981). Courts must evaluate the officer's conduct "in light of common sense and ordinary human experience," deferring to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Stephenson*, 452 F.3d 1173, 1176 (10th Cir. 2006). An officer need not rule out the possibility of innocent conduct in order to form reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 277 (2002). "*Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together

7

warranted further investigation.'" *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) (quoting *Terry*, 392 U.S. at 22). Once reasonable suspicion is formed, the officer is entitled to initiate an investigatory detention in order to dispel that suspicion. *Id.* at 30-31.

Eskridge relies on *United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir. 1988), to argue that evidence of at least a minor traffic infraction should be required in order to initiate a traffic stop. However, *Guzman*'s holding that pretextual stops were actionable under the Fourth Amendment was overruled by *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995) (en banc), which adopted a purely objective standard in judging the actions of police officers. We therefore find Eskridge's argument to be wholly without merit.

Here, Captain Howard had reasonable suspicion to stop Eskridge and Roland. By itself, each factor which the government points to in support of the detention would not be enough to justify the stop. However, when combined and viewed from the perspective of a trained law enforcement officer familiar with the scene, the factors observed by Captain Howard in their totality gave rise to an inference of illegal activity.

Eskridge's behavior after noticing Captain Howard is a factor that plays a large role in our analysis. "[N]ervous, evasive behavior [in the presence of law enforcement] is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Eskridge gave the Crown Victoria an alarmed

look as it passed, stopped what he was doing immediately, backed up the SUV into the gravel driveway hidden by trees to turn around, and then displayed indecision about what to do when confronted with the Crown Victoria the second time. This behavior is evidently indicative of nervousness and discomfort in the presence of a police officer.[3]

Certainly, evasive behavior alone is not enough. However, the circumstances and location of the scene also play a role in evaluating reasonable suspicion. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. The United States draws our attention to the manner in which the SUV was parked, which Captain Howard noted as odd for that particular area. Captain Howard was very familiar with the area and drove that route down Hutton Road daily. He thought that the placement of the car was suspicious because he had never before seen a vehicle parked in that particular manner in that particular location. Although Hutton Road, Kansas City is not a "high crime area," *see id.*, the odd location of the vehicle certainly added to the officer's suspicions. Captain Howard also observed frantic movements, the exact character of which could not be seen behind a tinted window, but which were consistent with

---

[3] Counsel for Eskridge at oral argument did not take issue with the notion that an officer in uniform driving a white unmarked Ford Crown Victoria constitutes the noticeable presence of law enforcement.

the commission of some type of an assault. "[I]n cases where 'the conduct justifying the stop was ambiguous and susceptible of an innocent explanation,' '*Terry* recognized that the officers could detain the individuals to resolve the ambiguity.'" *United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005) (quoting *Wardlow*, 528 U.S. at 125). In this case, criminal activity was one possibility out of a wide array of possible explanations for this conduct. Captain Howard was justified in initiating an investigatory detention in order to dispel his concern that illegal conduct was occurring.

### B.    Sufficiency of the Evidence at Eskridge's Trial

In two short paragraphs of his brief-in-chief, Eskridge challenges the sufficiency of the evidence to support his conviction. We find that this argument is waived on appeal due to the inadequate development of any factual or legal issues. *Femedeer v. Haun*, 227 F.3d 1244, 1255 (10th Cir. 2000) ("On appeal . . . parties must do more than offer vague and unexplained complaints of error. Perfunctory complaints that fail to frame and develop an issue are not sufficient to invoke appellate review." (internal quotation marks omitted)).

### C.    Roland's Sentence

Roland challenges his sentence on two grounds. First, he argues that the district court improperly calculated his sentence to include a relevant conduct enhancement on the basis of evidence that he possessed a third firearm in addition to the two firearms charged. Roland contends that the evidence was insufficient to

10

support this enhancement. Second, he argues that his sentence was improperly calculated because the district court applied a base offense level of 20 under a provision of the U.S. Sentencing Guidelines ("U.S.S.G.") which applies if the instant offense was committed subsequent to a felony conviction of a crime of violence. Roland argues that his prior felony conviction is not a "crime of violence" under federal law. We reject both challenges and affirm the sentence.

### 1.    Relevant Conduct

The district court calculated a 2-level relevant conduct enhancement under U.S.S.G. § 2K2.1(b)(1)(A) on the basis that Roland possessed a third firearm in addition to the two he pled guilty to possessing. The district court's factual finding that Roland possessed the third firearm is reviewed for clear error. A finding is clearly erroneous only "if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998). The government bears the burden of proving sentencing enhancements and increases by a preponderance of the evidence. *United States v. Keifer*, 198 F.3d 798, 800 (10th Cir. 1999).

At the sentencing hearing, the government presented testimony by a resident of the house that was burglarized by Roland and Eskridge. The witness testified that he had three firearms in his bedroom: two pistols and a shotgun. He kept the pistols in the closet, locked in a box with his name on it—the same box which Captain

11

Howard found in the back seat of Eskridge's car after the traffic stop. The witness indicated that he had last seen the pistols the month before the burglary, and that he believed no one else in the house had known where to find the key to the box. Finally, he testified that all three firearms and the box were missing from the residence after the burglary.

Roland argues that due to the length and thoroughness of the search conducted for the missing pistol, the district court's determination that he possessed the third firearm—one of the pistols—was clear error. Police personnel conducted several searches of the area, utilizing canines and even partly dredging a nearby pond, but could not find the missing firearm. We disagree that this evidence conclusively rules out the possibility that the third firearm was stolen by him or Eskridge. The district court clearly found the victim's testimony to be credible. It would be improper for us to weigh the victim's testimony against the other evidence to which Roland directs us. There is no clear error in the district court's conclusion.

### 2.    "Crime of Violence"

Roland next challenges the district court's determination that his prior conviction for burglary from 1996 was for a "crime of violence" pursuant to U.S.S.G. §§ 2K2.1(a)(4)(A) and 4B1.2(a), and contends that the base offense level of 20 was therefore incorrectly calculated. We review the district court's determination de novo. *United States v. Perez-Vargas*, 414 F.3d 1282, 1284 (10th Cir. 2005).

"When determining whether a prior conviction is a crime of violence, the Supreme Court has instructed sentencing courts to take a formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Id.* (internal quotation marks omitted). The Missouri statute under which Roland was convicted in 1996 defines the crime of first degree burglary in pertinent part as "knowingly enter[ing] unlawfully or knowingly remain[ing] unlawfully in a building or inhabitable structure for the purpose of committing a crime therein." Mo. Rev. Stat. § 569.160 (1979).

An "inhabitable structure" under Missouri state law includes "a ship, trailer, sleeping car, airplane, or other vehicle or structure [w]here any person lives or carries on business or other calling." *Id.* § 569.010(2). Under the Sentencing Guidelines, however, only the offense of burglary of a "dwelling" is a crime of violence. U.S.S.G. § 4B1.2. Under our precedent, a "dwelling" is "any 'enclosed space that is used or intended for use as a human habitation.'" *United States v. Rivera-Oros*, 590 F.3d 1123, 1132 (10th Cir. 2009) (quoting Black's Law Dictionary 582 (9th ed. 2009)). Thus, the state statute at issue defines "burglary" more broadly than does federal law, and as such it encompasses violent and non-violent crimes.

When the statutory count of conviction is ambiguous because it encompasses violent and non-violent crimes alike, the court looks beyond the statute to the charging document or other court records of comparable reliability and any

13

admissions the defendant made regarding the facts of his prior convictions. *Perez-Vargas*, 414 F.3d at 1285. At sentencing, the government bears the burden of proof to show that the defendant's prior conviction was one for a "crime of violence." *United States v. Rice*, 52 F.3d 843, 848 (10th Cir. 1995).

At sentencing, the government introduced the plea colloquy between the state court judge and Roland from the February 5, 1996 sentencing hearing. In this transcript, the burglarized building at issue was referred to as a "house" or a "residence" at least twelve times. R. Vol. 2 at 191. However, Roland himself apparently never referred to the building as a "residence"; only a "house." Roland reads *Shepard v. United States*, 544 U.S. 13 (2004), to hold that only statements that a defendant made or ratified can be considered in determining the type of crime for which he has a prior felony conviction. Roland therefore argues that the record is ambiguous as to whether the structure in question was a dwelling or a house with a business or something else in it that would qualify as an "inhabitable structure" but not a "dwelling."

We find this argument to be somewhat disingenuous. "House" and "residence" are synonymous and both mean "dwelling." *See* Black's Law Dictionary 807 (Brian Garner ed., 9th ed. 2009) (defining "house" as a "home, dwelling, or residence"); *id.* at 1423 (defining "residence" as a "house or other fixed abode; a dwelling"). In addition, *Shepard* cannot fairly be read as indicating that the specific relevant word in the plea colloquy must come from the defendant himself. It is sufficient if the

14

factual basis for the plea is summarized by another party—an attorney for the defense or the government, or the court—and then confirmed by the defendant. There is no requirement that the factual basis be stated in a defendant's own words.[4] We agree with the district judge below, who noted that "if the Judge was talking about him [the defendant] burglarizing a residence and it wasn't a residence, he would have said something to that effect." R. Vol. 2 at 194.

Roland objects that because the government bears the burden of proving enhancements in the 2009 sentencing hearing, it was improper to place the burden on him to object to the word "residence" in the 1996 sentencing hearing. One issue has nothing to do with the other. The United States' burden in the instant case does not affect the fact that Roland allowed the judge to think it was a "residence" at the 1996 hearing. Therefore, we find there was ample evidence in the record to support the district court's determination that Roland had a prior felony conviction of a crime of violence.[5]

---

[4] Another panel of this Court has reached the same conclusion in *United States v. Wright*, 166 F. App'x 393, 395-96 (10th Cir. 2006) (unpublished table decision). The decision is not binding on this panel, but we agree with its reasoning.

[5] We note that resolving this issue would have been significantly easier had counsel included a copy of the transcript of this plea colloquy in the record on appeal.

Based on the foregoing, we AFFIRM the judgments of the district court as to both Eskridge and Roland.

Entered for the Court,


William P. Johnson
United States District Judge