**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

v.

DARYL TAYLOR,

    *Defendant-Appellant.*

No. 09-5152

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

v.

ANTWAN THOMPSON, a/k/a Darrell Thompson,

    *Defendant-Appellant.*

No. 10-4054

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:08-cr-00507-CCB-1; 1:08-cr-00507-CCB-2)

Argued: September 21, 2011

Decided: October 24, 2011

Before WILKINSON, MOTZ, and DAVIS, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz joined. Judge Davis wrote an opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Joanna Beth Silver, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland; Jonathan Alan Gladstone, Annapolis, Maryland, for Appellants. Cheryl L. Crumpton, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellants. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

A jury convicted Daryl Taylor and Antwan Thompson of being felons in possession of a firearm under 18 U.S.C. § 922(g)(1) after they were caught with a loaded handgun on a Baltimore street. The district court imposed an eight-year sentence on Taylor and a fifteen-year sentence on Thompson because his prior convictions qualified him for the mandatory minimum under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). We now affirm.

### I.

### A.

While on street patrol in an unmarked van on the night of May 30, 2008, members of the Baltimore Police Department spotted Taylor standing near the passenger side of an Acura.

Taylor's location was illuminated by multiple streetlights as well as the headlights of the van. Shortly thereafter, one of the officers, Detective Jermaine Cook, saw Taylor reach into his waistband, pull out a silver handgun, and pass it to Thompson through the Acura's passenger side window. Detective Cook instantly alerted the other three detectives in the van, none of whom were looking in the Acura's direction at the time.

The van promptly came to a stop. The officers got out of the vehicle and Cook put Taylor under arrest. Thompson, on the other hand, fled from the Acura and was pursued by two of the other detectives. During the chase, one of the officers saw a silver handgun fall out of Thompson's shorts. The detective recovered the loaded weapon, which had been reported stolen prior to its discovery that evening. Thompson was apprehended soon thereafter.

A jury subsequently convicted both Taylor and Thompson of violating 18 U.S.C. § 922(g)(1), which prohibits convicted felons from possessing a firearm. Because the handgun was stolen, Taylor's Pre-Sentence Report ("PSR") recommended a two-point offense level increase under U.S.S.G. § 2K2.1(b)(4)(A). When added to Taylor's base offense level of twenty-four points and his Criminal History Category of IV, this enhancement resulted in a Guidelines range of 92 to 115 months. At his sentencing hearing, however, Taylor argued for a lesser punishment. Specifically, he objected to the two-point enhancement because he was unaware that the handgun was stolen. He then contended that a number of mitigating circumstances such as his lack of a history of violence and his efforts to turn his life around also mandated a lesser sentence. Noting that this was "certainly a very serious offense," the district court rejected Taylor's contentions and imposed a ninety-six month sentence.

B.

In Thompson's case, the PSR recommended a fifteen-year minimum sentence under the ACCA because he had previ-

ously been convicted twice for controlled substance offenses and once for second-degree assault. Under the ACCA, anyone who violates 18 U.S.C. § 922(g) and has three prior convictions for "violent felon[ies]" or "serious drug offense[s]" must serve a sentence of at least fifteen years. 18 U.S.C. § 924(e)(1). To avoid this mandatory minimum, Thompson argued that his Maryland second-degree assault conviction was not a "violent felony."

In support of this sentence, the government submitted a transcript of Thompson's plea colloquy for his assault conviction. According to this transcript, after being informed of his rights, Thompson's attorney asked him if "it is still your intention to plead guilty?" He responded, "Yes, ma'am." Following this answer, the prosecutor read a statement of facts supporting Thompson's plea.

According to the prosecution's report at the plea colloquy, on the night of May 10, 2002, Officers Bateem, Geolamas, and Guzman of the Baltimore Police Department tried to arrest Thompson at a corner store for his involvement in a drug deal. When they approached Thompson, however, he threw a Styrofoam cup filled with liquid at Officer Geolamas, "striking him in the chest area," "punched Officer Bateem in the mouth," and "then attempted to flee."

Officer Guzman was able to grab a hold of the suspect, however, and the two other officers assisted him by "taking [Thompson] down to the ground." A struggle followed on a concrete sidewalk as the three officers tried to gain control of Thompson's hands. During the struggle, Thompson swung his arms and kicked his feet and repeatedly attempted to draw his handgun from the waistband of his pants. Despite Officer Guzman's eventual use of a burst of pepper spray, the officers and Thompson "continued to fight." Thompson then attempted to grab Guzman's firearm from his holster, at which point Officer Geolamas put his hands over Thompson's hands in order to prevent him from acquiring the weapon.

"Backup units eventually arrived at the scene and assisted the officers at hand, cuffing Mr. Thompson who continued to struggle in his duress."

When the prosecutor finished reading this statement, the state judge asked Thompson's attorney whether she had "[a]ny additions or corrections," to which she replied, "No, Your Honor." The court then ruled, "Based on that statement of the facts, Mr. Thompson, I find you guilty of . . . assaulting Officer Geolamas." Thompson's attorney then turned to her client and asked, "[I]s there anything that you would like to say to the judge? I have spoken on your behalf this morning. You have an opportunity to speak if you'd like to or you can remain silent. Is there anything else you'd like to say?" Thompson replied, "No, ma'am." During the entire plea colloquy, neither Thompson nor his counsel protested his innocence, disputed his guilt, or disagreed with the prosecutor's statement of the facts.

After reviewing this document, the federal district court held that the transcript "clearly show[s] a physical assault involving the use of force or violence against a police officer by Mr. Thompson." It consequently rejected Thompson's challenge to his ACCA status and sentenced him to the mandatory minimum of fifteen years imprisonment.

## C.

On appeal, Taylor challenges both his conviction and sentence. He claims that the jury lacked sufficient evidence to convict him of violating 18 U.S.C. § 922(g)(1), that the lack of a mens rea requirement renders the stolen firearm sentencing enhancement invalid, and that his sentence is substantively unreasonable. Thompson, on the other hand, objects only to his sentence under the ACCA by contending that his Maryland assault conviction does not constitute a "violent felony." We shall address each appellant and his arguments in turn.

## II.

## A.

We begin with Taylor and his claim that the jury lacked sufficient evidence to convict him of violating 18 U.S.C. § 922(g)(1). In brief, Taylor contends that there was not enough evidence presented at trial to prove that he actually possessed the stolen handgun. To prove the point, he launches an extended attack on Detective Cook's credibility. He contends that Cook's testimony regarding when he first saw Taylor, when the handoff of the gun occurred, and where the van came to a stop results in an incoherent and impossible timeline of events that cannot be squared with the narratives of the other officers. Given that Cook was the only officer who saw the handoff that night, Taylor insists his conviction must be overturned.

As an initial matter, any sufficiency claim bears a heavy burden. We cannot set aside a jury's verdict if it is supported by substantial evidence when viewed in the light most favorable to the government. *See United States v. Robinson*, 627 F.3d 941, 956 (4th Cir. 2010). Fatal to Taylor's case is the fact that on appeal, "we are not entitled to assess witness credibility, and we assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Jeffers*, 570 F.3d 557, 565 (4th Cir. 2009). At trial, Taylor challenged Cook's testimony on grounds strikingly similar to those he now presses on appeal. But at the end of the day, the jury rejected Taylor's arguments in favor of Cook's testimony.

Moreover, there was ample evidence here to establish Taylor's possession of the firearm. According to the testimony, multiple detectives saw Taylor standing near the Acura's passenger side in a well-lit area. While the other officers were looking in another direction, Detective Cook observed Taylor pass a silver handgun to Thompson through the Acura's window. The other detectives confirmed that Cook immediately

alerted them to the handoff. As soon as the officers exited the van, Thompson fled from the Acura and then dropped a silver handgun during his unsuccessful attempt to escape. This evidence would plainly allow a reasonable jury to find Taylor guilty of unlawful possession under 18 U.S.C. § 922(g)(1).

## B.

## 1.

Apart from his challenge to his conviction, Taylor raises two objections to the length of his sentence. He first contests the district court's application of the Guidelines' two-point enhancement for possession of a stolen firearm. Section 2K2.1(b)(4)(A) of the Guidelines instructs courts to increase a defendant's offense level by two points if the firearm involved in a section 922(g) offense was stolen. This enhancement "applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen." U.S.S.G. § 2K2.1 cmt. n. 8(B). Taylor asks that we invalidate this guideline on the grounds that its lack of a mens rea requirement renders it inconsistent with federal law.

This we cannot do. As an initial matter, we note that the stolen firearm enhancement serves an important purpose. The Sentencing Commission "promulgated [this guideline] on the premise that 'stolen firearms are used disproportionately in the commission of crime.'" *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (citation omitted). In light of the fact that stolen firearms change hands both freely and frequently, we would be hard-pressed to discredit the Commission's judgment that a felon in possession of a stolen firearm should be treated differently from one who possessed a gun through lawful means. *See United States v. Ellsworth*, 456 F.3d 1146, 1150 (9th Cir. 2006) (confirming that a felon in possession of a stolen firearm is more culpable than one who acquires a gun legally because stolen weapons are more frequently used to

commit crimes); *United States v. Schnell*, 982 F.2d 216, 220-21 (7th Cir. 1992) (same); *Mobley*, 956 F.2d at 454(same).

Nor is it fatal that the enhancement lacks a mens rea component. While a preference for mens rea is deeply rooted in our jurisprudence, *see Staples v. United States*, 511 U.S. 600, 605 (1994), the absence of this element is not invariably the final word in criminal law. Instead, as the Supreme Court has observed, "[I]t is not unusual to punish individuals for the unintended consequences of their *unlawful* acts." *Dean v. United States*, 129 S. Ct. 1849, 1855 (2009) (emphasis in original). The felony-murder rule, under which a defendant can be convicted for murder if he commits an unintentional homicide during the course of another felony, is perhaps the most obvious illustration of the point. *Id.* The idea behind this principle is a simple one: those "wishing to avoid the penalty for" the unintended consequences of their crime should "avoid committing the felony in the first place." *See id.* at 1856. This is the situation we have here. Had Taylor chosen not to possess the handgun unlawfully to begin with, he would never have been punished for the possession or spread of stolen firearms.

It is therefore unsurprising that every circuit to have considered a challenge to the sentencing enhancement in section 2K2.1(b)(4)(A) has upheld the guideline. *See United States v. Thomas*, 628 F.3d 64, 68-71 (2d Cir. 2010); *Ellsworth*, 456 F.3d at 1149-51; *United States v. Williams*, 365 F.3d 399, 407-08 (5th Cir. 2004); *United States v. Martinez*, 339 F.3d 759, 761-62 (8th Cir. 2003); *United States v. Murphy*, 96 F.3d 846, 848-49 (6th Cir. 1996); *United States v. Richardson*, 8 F.3d 769, 770 (11th Cir. 1993); *United States v. Sanders*, 990 F.2d 582, 584 (10th Cir. 1993), *overruled on other grounds by United States v. Gomez-Arrellano*, 5 F.3d 464, 466-67 (10th Cir. 1993); *Schnell*, 982 F.2d at 219-21; *Mobley*, 956 F.2d at 454-59; *United States v. Taylor*, 937 F.2d 676, 681-82 (D.C. Cir. 1991). The Third Circuit has best captured the reasoning of these courts with its observation that "stolen . . .

firearms in the hands of people recognized as irresponsible pose great dangers, and the guideline here reflects this heightened danger." *Mobley*, 956 F.2d at 454.

In sum, we cannot see how the absence of a scienter requirement works to invalidate the enhancement. An unlawful course of conduct inevitably carries its share of risks. *See Dean*, 129 S. Ct. at 1855-56 ("An individual who brings a loaded weapon to commit a crime runs the risk that the gun will discharge accidentally."). Section 922(g)(1) prohibited Taylor from possessing *any* firearm, whether or not it was stolen. If Taylor were actually concerned about the risk of acquiring a stolen weapon, there was a readily available solution: he could have simply obeyed the law. When he decided not to do so, he assumed the attendant risks of criminal conduct, including the possibility that his newly acquired firearm might be stolen. *See United States v. Griffiths*, 41 F.3d 844, 845 (2d Cir. 1994) ("[T]he government has a legitimate interest in punishing possession of a stolen firearm and placing the burden upon one who receives a firearm to ensure that the possession is lawful."). For the foregoing reasons, we must decline Taylor's invitation to invalidate the enhancement in section 2K2.1(b)(4)(A) of the Sentencing Guidelines.

2.

Taylor also claims that his ninety-six month sentence was substantively unreasonable due to mitigating factors and the comparatively innocuous nature of his conduct. We review a district court's sentence "under a deferential abuse-of-discretion standard," *Gall v. United States*, 552 U.S. 38, 41 (2007), and presume on appeal that a sentence within a properly calculated advisory Guidelines range is a reasonable one. *United States v. Allen*, 491 F.3d 178, 193 (4th Cir. 2007). Given that Taylor's ninety-six month sentence fell within his properly determined Guideline range of 92 to 115 months, we apply that presumption here.

Under the facts of this case, the district court's sentence falls well within the range of reasonable punishments. Taylor's instant offense involved dangerous conduct. After illegally obtaining a stolen firearm, Taylor carried this loaded weapon on a Baltimore street before handing it to Thompson through a car window. Taylor's previous encounters with the law proved to have little or no deterrent effect. And the supposed mitigating circumstances were neither supported nor verified. The trial court's statement provides a good example of reasoned sentencing discretion:

> [I]t seems to me that a sentence of 96 months, which . . . is within the advisory guideline range, is sufficient in this case without being greater than necessary. This is certainly a very serious offense. . . . [A]t this time the gun was not being used in a violent way. I appreciate that. Mr. Taylor, again, at this particular time, was not associated with narcotics. However, unfortunately, Mr. Taylor . . . very recently had been released from incarceration following a serious drug offense. He has a prior serious drug offense from when he was much younger, admittedly. But unfortunately, that pattern seemed to have continue[d]. And he was fairly recently released from incarceration when, according to the jury's verdict, he was found in possession of a loaded, stolen weapon on the streets of Baltimore City, which is a dangerous behavior and requires a significant sanction.

## III.

We now turn to Thompson and his challenge to his sentence under the ACCA. As noted, the ACCA imposes a fifteen-year minimum sentence on anyone who both violates 18 U.S.C. § 922(g) and has three prior convictions for "serious drug offense[s]" or "violent felon[ies]." 18 U.S.C. § 924(e)(1). Thompson contests neither his section 922(g)(1)

conviction nor the fact that his two previous cocaine convictions amount to "serious drug offense[s]." *See* 18 U.S.C. § 924(e)(2)(A). His sole argument on appeal is that the district court erred in concluding that his third predicate conviction for Maryland second-degree assault constitutes a "violent felony."

A.

The ACCA defines "violent felony" in two ways. The district court relied on only one of them. Specifically, it found that Thompson's assault conviction qualified under the "force clause" of the ACCA, which defines a "violent felony" as an offense which "has as an element the use, attempted use, or threatened use of physical force against the person of another." *Id.* § 924(e)(2)(B)(i).

While the preferred framework for addressing whether prior convictions qualify as ACCA predicates is the categorical approach set forth in *Taylor v. United States*, 495 U.S. 575, 600-02 (1990), under which we consider simply the statutory elements of the offense and the fact of conviction, our precedent forecloses that option here. The Maryland statute prohibiting second-degree assault provides that "[a] person may not commit an assault," which in turn is defined as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." Md. Code Ann., Crim. Law §§ 3-201(b), -203(a). Because this definition is so broad, we have frequently recognized our inability to discern from a conviction and the statute's elements alone whether a defendant actually committed a violent felony. *See United States v. Alston*, 611 F.3d 219, 222-23 (4th Cir. 2010) (using modified categorical approach to determine whether Maryland second-degree assault qualifies as a violent felony); *United States v. Harcum*, 587 F.3d 219, 224 (4th Cir. 2009) (same).

The district court was therefore correct to employ the modified categorical approach set forth in *Shepard v. United*

*States*, 544 U.S. 13 (2005), to guide its analysis. *See Harcum*, 587 F.3d at 224. Under this approach, courts must decide whether *Shepard*-approved materials such as the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented" show that Thompson "necessarily admitted" to committing a violent felony. *See Shepard*, 544 U.S. at 16.

## B.

We cannot find fault with the district court's application of the modified categorical approach in this case. To begin, the trial court considered only *Shepard*-approved documents in reaching its conclusion, namely the "transcript of [Thompson's] plea colloquy." *See id.*

That transcript portrays what can only be described as a "violent felony." According to the Supreme Court, the term "physical force" in the "force clause" of the ACCA means "*violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 130 S. Ct. 1265, 1271 (2010) (emphasis in original). Thompson's conduct as described in the plea colloquy plainly fits this definition. Facing arrest for a drug deal, Thompson "str[uck] [an officer] in the chest area" with a cup of liquid, punched another one in the mouth, and attempted to escape. Three police officers then had to "wrestl[e] [him] on the ground to gain control of his hand" while he was flailing his arms and legs. Further, Thompson "continued to reach for his handgun" as well as Officer Guzman's firearm during the struggle, raising the likelihood that his arrest could have ended in serious injury or death. In fact, his resistance was so vigorous that the three officers were unable to restrain him until backup units had arrived. As the state court noted at the plea hearing, Thompson had plainly been "fighting with police officers on the street."

Thompson nevertheless relies on the court's statement of "I find you guilty of . . . assaulting Officer Geolamas" to contend that he was convicted "only" of striking a police officer in the chest area with a cup of liquid. But even if we confine Thompson's conduct to his interactions with Officer Geolamas, he is still guilty of a violent felony. Not only did Thompson throw a Styrofoam cup of liquid at Geolamas that evening. Thompson was vigorously resisting Officer Geolamas's attempt to arrest him, during which, according to the plea transcript, he swung his limbs "very radically" and repeatedly sought to secure a firearm. The fact that it took more than three police officers to finally subdue Thompson is testament to the violent nature of the assaultive conduct. In short, Thompson's behavior on the occasion of his predicate offense involved "the use, attempted use, or threatened use of [force capable of causing physical pain or injury to another person.]" 18 U.S.C. § 924(e)(2)(B)(i); *Johnson*, 130 S. Ct. at 1271. The district court did not err in concluding that the *Shepard*-approved materials here demonstrate Thompson's involvement in a violent felony.

## C.

To avoid these facts, Thompson argues that he never actually admitted them during his plea colloquy. He relies on our decision in *United States v. Alston*, 611 F.3d 219, 220-21 (4th Cir. 2010), which held that a conviction for second-degree assault under Maryland law cannot serve as an ACCA predicate when it is the result of an *Alford* plea. Thompson contends that his conviction stems from an *Alford* plea as well because he did not personally and explicitly assent to the prosecution's statement of the facts.

Simply put, Thompson's plea is not an *Alford* plea. An *Alford* plea is an arrangement in which a defendant maintains his innocence but pleads guilty for reasons of self-interest. *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970). Its "distinguishing feature" is "that the defendant does *not* confirm" the

factual basis underlying his plea, *Alston*, 611 F.3d at 227 (quoting *United States v. Savage*, 542 F.3d 959, 962 (2d Cir. 2008)). The purpose of a statement of facts in this context is not to establish guilt but to ensure merely that "the plea [is] being intelligently entered." *See Alford* at 37–38. In short, an *Alford* plea is an intentional, specific action which serves a distinct function in the law, namely that of ensuring that a defendant's "protestations of innocence" do not undermine confidence that the constitutional requirement that a plea of guilty be voluntary and intelligent has been satisfied. *See id.* at 33, 37-39.

In *Alston*, we clarified the role of this plea arrangement in a modified categorical approach. Relying on *Shepard*'s instruction that courts should consider a "transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant" to determine whether a guilty plea "necessarily admitted" conduct amounting to a violent felony, we held that conviction resulting from an *Alford* plea could not serve as an ACCA predicate. *Alston*, 611 F.3d at 227 (emphasis omitted) (quoting *Shepard*, 544 U.S. at 26). Because Alston had pleaded guilty without ever agreeing to the "truth of the proffered facts," we could not find under *Shepard* that he had confirmed his involvement in a violent felony. *Id.* at 221, 227-28.

Thompson's plea could not be more different. After being informed of his rights, Thompson's attorney asked her client whether "it is still your intention to plead guilty?" Thompson answered, "Yes, ma'am." Following the prosecution's statement of facts, the judge then asked Thompson's counsel if she had "[a]ny additions or corrections" to make to the record. She responded, "No, Your Honor." Thompson's attorney then told her client, "I have spoken on your behalf this morning. . . . Is there anything else you'd like to say?" Thompson replied, "No, ma'am."

There is no evidence in the entire transcript that Thompson intended to do anything other than plead guilty that day. The

colloquy was replete with opportunities for him to challenge his factual guilt, but nothing of the sort ever occurred. Not once during the hearing did he protest his innocence, attempt to correct the statement of the facts, or even remotely signal that he was interested in an *Alford* plea. We refuse to dress a perfectly ordinary guilty plea in *Alford* garb in order to avoid an ACCA enhancement.

The fact that it was Thompson's lawyer rather than the defendant himself who declined to make any corrections to the factual record does not alter our analysis. To be sure, *Shepard* discussed a plea colloquy "in which the factual basis for the plea was confirmed by *the defendant*," 544 U.S. at 26 (emphasis added), but we believe that any reasonable interpretation of those words must include the defendant's lawyer as well. The notion that the term "defendant" nullifies all representations to the court made by his attorney is not a realistic one. As the Supreme Court has observed, "As to many decisions pertaining to the conduct of the trial, the defendant is deemed bound by the acts of his lawyer-agent." *New York v. Hill*, 528 U.S. 110, 115 (2000) (internal quotation marks omitted).

Thompson's lawyer was at the plea hearing for a reason, namely to advise, represent, and speak for her client. She spoke in her client's presence and confirmed, with no recorded murmur of dissent from her client, that she had no additions or corrections to the prosecution's statement of the facts. Moreover, Thompson himself both confirmed his intention to plead guilty and refused to make any corrections when given another chance to speak.

Taken as a whole, the plea proceedings afford ample support for the finding of the district court that Thompson's plea of guilty constituted an admission of the violent conduct reflected in the sole proffered factual basis for the plea. To be sure, the modified categorical approach described in *Shepard* cabins district court discretion to an extent, yet if the primacy

of trial courts in the sentencing process envisioned in *Gall* is to be respected, the district court's reasonable conclusions from a *Shepard*-approved document must be upheld.*

---

*It follows that we cannot accept the position of our friend in dissent. Before us is simply the question of whether the district court properly concluded from the relevant *Shepard* documents that Thompson's prior conviction was a qualifying predicate. In the course of making that finding, we believe the district court was entitled to rely on those facts and circumstances in the plea colloquy it felt relevant. These include Thompson's own statement that it was his intention to plead guilty, the proffer given by the prosecution, the statement of the defendant's attorney that she had no additions or corrections to that proffer, Thompson's statement confirming that he himself had nothing to add, and of course, the comments of the court. The dissent essentially seeks to magnify this into a collateral constitutional attack on a prior conviction, but it is not that nor is this the forum for that inquiry. As the dissent acknowledges, the modified categorical approach is not "a textually-rooted fundamental constitutional right," *post* at 22, but a practical tool for district judges to ascertain reliably what was the nature of the prior offense without imposing undue burdens on the trial court's sentencing function.

The sole question therefore is whether the district court made a proper finding that Thompson's second degree assault conviction was for a crime of violence. We think without question that the trial court made that finding and that the plea colloquy amply supports its conclusion. To summarize again, Thompson himself indicated that he wished to plead guilty, the proffer was read in his presence, his attorney confirmed in his presence that she had no additions or corrections to make, and Thompson then stated he had nothing to add. At no time did either Thompson or his attorney dispute anything regarding the factual proffer despite ample opportunity at various junctures in the hearing to do so. No exception was taken at any point by anybody to the fact that the nature of the assault was violent, even to the point of involving Thompson's intense struggle to seize both his own and Officer Guzman's weapons. As the dissent rightly notes, the *Shepard* inquiry is not a "talismanic" one. *Post* at 23. As evidenced by *Shepard*'s references to a variety of judicial documents as well as to a "'comparable judicial record' of the factual basis for the plea," *Nijhawan v. Holder*, 129 S. Ct. 2294, 2299 (2009) (quoting *Shepard*, 544 U.S. at 26), the Court's purpose was not to invoke a litmus test but to provide a sentencing court with the tools to do what sentencing courts do every day—make a sound and proper sentencing determination. This the district court did.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

DAVIS, Circuit Judge, concurring in part and dissenting in part:

I concur in those portions of the majority opinion affirming the conviction and sentence of Appellant Taylor. With respect, however, I dissent from so much of the majority opinion as affirms the sentence of Appellant Thompson. I explain.

The holding of *Shepard v. United States* could not be stated more clearly than how Justice Souter stated it:

> We hold that enquiry under the ACCA to determine whether a plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy *between judge and defendant* in which the factual basis for the plea was *confirmed by the defendant*, or to some comparable judicial record of this information.

544 U.S. 13, 26 (2005) (emphasis added).[1] I refer to the highlighted language as "the *Shepard* guarantee."

Despite the pristine clarity of *Shepard*'s holding, the majority concludes that garden variety agency principles permit a rewriting of it. Thus, according to the majority, it can ignore

---

[1]Although the entirety of Justice Souter's opinion in *Shepard* was joined only by three other justices, Justice Thomas concurred in the portion of Justice Souter's opinion quoted above. *See* 544 U.S. at 28.

*Shepard*'s admonition that in applying the modified categorical approach, a guilty plea transcript must show a "colloquy between [the] judge and [the] defendant" and that "the factual basis for the plea [be] confirmed by the defendant." Rather, the majority insists, the *Shepard* holding may be revised to read: a guilty plea transcript must show a "colloquy between [the] judge and [the] defendant [or his attorney]," and that "the factual basis for the plea [must be] confirmed by the defendant [or his attorney]."[2] This rewriting of the *Shepard* guarantee is unwarranted and unjustified.

---

[2]As Thompson cogently argues before us, even apart from the question of whether his lawyer's words should be charged to him and treated as a binding judicial admission under the modified categorical approach to the ACCA, it is a stretch to regard a lawyer's statement that there are "no additions or deletions" to a prosecutor's proffer in support of a guilty plea as a binding judicial admission of the truth of the potential evidence just summarized. *See generally United States v. McMurray*, 653 F.3d 367 (6th Cir. 2011).

Maryland law and practice plainly are to the contrary. *See Bishop v. State*, 7 A.3d 1074, 1085-86 (Md. 2010) (describing "hybrid pleas" under Maryland criminal practice and explaining: "There is a distinction between an agreed statement of facts and evidence offered by way of stipulation. Under an agreed statement of facts both [the] State and the defense agree as to the ultimate facts . . . . On the other hand, when evidence is offered by way of stipulation, there is no agreement as to the facts which the evidence seeks to establish. Such a stipulation only goes to the content of the testimony of a particular witness if he were to appear and testify.") (quoting *Barnes v. State*, 354 A.2d 499, 505–06 (Md.App. 1976)). Without question, and ironically, the Maryland Court of Appeals would never treat Thompson's attorney's statement that she had "no additions or deletions" to the prosecutor's proffer of how the prosecutor's witnesses would testify were the case to go forward to trial, as a binding judicial admission by Thompson regarding the *truth* of an evidentiary proffer to establish a factual basis for a guilty plea. *Id. See also McMurray*, 653 F.3d at 380 ("The state trial court was not required to determine the truth of the state's proffered facts relating how the crime was committed before accepting McMurray's best-interest plea of guilty. The factual-basis requirement in Federal Rule of Criminal Procedure 11 and the equivalent state criminal-procedure rules, including Tennessee, is designed to help the trial judge evaluate the voluntariness of the defendant's plea."); *id.* at 387 (McKeague, J., dissenting) ("And while a factual basis was read at the plea colloquy, the sentencing judge never asked the defendant to confirm or

As the government concedes, in this case, the record shows conclusively that the state court judge never even addressed a question to the then seventeen-year-old Thompson regarding his agreement or disagreement with the state prosecutor's proffer. *See* Gov't Br. at 29 ("After the prosecutor completed the factual proffer, *the state court asked defense counsel*, 'Any additions or corrections?'") (emphasis added).[3] Clearly, Thompson never had an opportunity to answer a question that the judge never asked him. I can find no evidence in any Supreme Court authority (and the majority opinion cites none) that the Supreme Court intended to permit an attorney's say-so, rather than the defendant's own personal admission (as *Shepard* makes plain), to ratchet up the maximum sentence for a conviction under 18 U.S.C. § 922(g)(1) from ten years' incarceration to life in prison, together with a mandatory minimum sentence of 15 years' incarceration.

This does not mean, of course, "that the specific relevant word in the plea colloquy must come from the defendant himself." *United States v. Eskridge*, 420 F. App'x. 837, 844 (10th Cir. 2011). Rather, "[i]t is sufficient if the factual basis for the plea is summarized by another party—an attorney for the defense or the government, or the court," *so long as the fac-*

---

accept—by *Alford* plea or otherwise—that factual basis. The court merely had the factual basis read, and then later asked, 'Are you entering a best interest plea of guilty on that one charge of aggravated assault?' to which McMurray replied 'Yes, sir.' Therefore, the state [sic] failed to establish that McMurray 'necessarily' pleaded guilty to a violent felony . . . .").

[3]Indeed, as the majority opinion only implicitly acknowledges, *see* Maj. Op. at 4, 14, 15, the state court judge in Thompson's second degree assault case never even asked Thompson for his plea or invited him to change his extant not guilty plea to a guilty plea; in short, Thompson never actually pled guilty, *viva voce*. Rather, on several occasions during the plea colloquy, Thompson reiterated (in response to questions by his own attorney) that it was his "intention" to plead guilty. *Id.* I need not and do not rely on this glaring omission, however, because the transcript of Thompson's guilty plea colloquy is otherwise insufficient to satisfy *Shepard* for the reasons discussed.

*tual basis is "then confirmed by the defendant." Id.* (emphasis added); *cf. United States v. Wright*, 166 F. App'x. 393, 395 (10th Cir. 2006) (after prosecutor's proffer in support of the defendant's guilty plea to state burglary charge, judge asked defendant, "[y]ou heard the Assistant District Attorney state the evidence they would produce in this matter were you to go to trial. Do you dispute any portion of that evidence?" and defendant answered "no" and defense attorney separately responded "no" to similar question, held: "[T]he factual basis for the plea did not rest solely on the prosecutor's statement. Wright was given an opportunity to either confirm or dispute the factual basis, and he confirmed it. Defense counsel also had an opportunity to dispute the factual basis and declined;" ACCA enhancement affirmed).[4]

---

[4]Contrary to the government's argument that Thompson has somehow waived his claim of error as to the district court's application of the ACCA, I agree with the majority of the panel that there is no genuine question as to whether Thompson has properly preserved the issue on appeal. *See* Appellants' Br. at 10 ("[T]he transcript of the guilty plea underlying [Thompson's second degree assault conviction] reveals no admission of wrongdoing by Mr. Thompson."); J.A. at 593 (defense counsel asserting that Thompson "did not qualify as an ACCA"); J.A. at 601 (defense counsel arguing at sentencing that, "[s]econd degree assault by itself is not a crime of violence and has been so held and rightly so.")

To be sure, Thompson has dressed his arguments before us in the garb of *United States v. Alston*, 611 F.3d 219, 222-23 (4th Cir. 2010) (holding that a prior conviction based on an *Alford* plea does not support application of the ACCA), which was decided many months *after* his sentencing hearing. But, as the holding in *Alston* is itself based squarely on the plain language of *Shepard*, *Alston*'s specific reliance on the fact that the defendant in that case had tendered an *Alford* plea is wholly inconsequential to the properly preserved ACCA issue in this case. *See United States v. Vann*, ___ F.3d ___, ___, slip op. at 10 (4th Cir. 2011) (en banc) ("*Shepard* prevents sentencing courts from assessing whether a prior conviction counts as an ACCA predicate conviction by relying on facts neither inherent in the conviction nor admitted by the defendant." (quoting *Alston*)); *see also United States v. Flores–Vasquez*, 641 F.3d 667, 672–73 (5th Cir. 2011) ("[T]he mere fact that a defendant enters a plea denominated as an 'Alford plea' does not preclude a sentencing court from relying upon a proffer of facts which was independently confirmed by the defendant."), *cert. denied*, ___ S.Ct. ___ , No. 11-6006, 2011 WL 4536495

The very case cited by the majority in support of its expansive agency theory, *New York v. Hill*, 528 U.S. 110 (2000), illustrates what we all well know: there exists a limited category of decisions, recognized in every state's system of criminal justice (as well as in the federal system), that the law has long regarded, jealously, as the defendant's alone, personally, to make. Specifically, in a passage from *Hill* not quoted in the majority opinion, Justice Scalia carefully explained as follows:

> What suffices for waiver depends on the nature of the right at issue. "[W]hether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." For certain fundamental rights, the defendant must personally make an informed waiver. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464-465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (right to counsel); *Brookhart v. Janis*, 384 U.S. 1, 7-8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (right to plead not guilty). For other rights, however, waiver may be effected by action of counsel. "Although there are basic rights that the attorney cannot waive without the fully informed

---

(U.S. Oct. 3, 2011). *But see United States v. Toyer*, 414 F. App'x. 584 (4th Cir. 2011) (unpublished) (strictly limiting the holding in *Alston* to prior convictions based on formal *Alford* pleas).

In any event, only a future *en banc* court will be able to reconcile the majority's holding and rationale in this case with the holding and rationale in *Alston*. This is so because the acts and statements of Thompson's agent/lawyer in this case are indistinguishable in form or substance from the acts and statements of Alston's agent/lawyer. *See Alston*, 611 F.3d at 221 ("Following the proffer, Alston, *through counsel*, stipulated that the State's witnesses would have testified [that he had pointed a handgun at three victims], but Alston never agreed to the truth of the proffered facts.") (emphasis added).

> and publicly acknowledged consent of the client, the lawyer has-and must have-full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 417-418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). As to many decisions pertaining to the conduct of the trial, the defendant is "deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" Thus, decisions by counsel are generally given effect as to what arguments to pursue . . . , what evidentiary objections to raise . . . , and what agreements to conclude regarding the admission of evidence. Absent a demonstration of ineffectiveness, counsel's word on such matters is the last.

*Hill*, 528 U.S. at 114-15 (some citations omitted).

At least under existing Supreme Court precedents, the *Shepard* guarantee does not rise to the level of a textually-rooted fundamental constitutional right. *But see United States v. Thompson*, 421 F.3d 278, 282 n. 3 (4th Cir. 2005) (Wilkinson, J.) ("It did not escape the Court's notice in *Shepard* that the rule it announced might have constitutional implications.").[5] Still, the majority's decision here is profound. It assigns the waiver of protection afforded by the *Shepard* guarantee, the

---

[5]Of course, what Judge Wilkinson was alluding to, in part, in his discussion in *Thompson*, 421 F.3d at 282 n. 3, was the following passage from Justice Souter's opinion in *Shepard*, in which the Justice reiterated the wisdom of *Taylor*'s categorical approach, as refined in *Shepard*:

> The Court thus anticipated the very rule later imposed for the sake of preserving the Sixth Amendment right, that any fact other than a prior conviction sufficient to raise the limit of the possible federal sentence must be found by a jury, *in the absence of any waiver of rights by the defendant*.

*Shepard*, 544 U.S. at 24 (emphasis added). *Cf. United States v. Milam*, 443 F.3d 382, 387 (4th Cir. 2006) ("To presume, infer, or deem a fact admitted because the defendant has remained silent, however, is contrary to the Sixth Amendment.").

requirement that the state court judge have engaged in a collo-
quy "with the defendant" and that "the defendant" have con-
firmed the dispositive facts (that could later lead to a doubling
or tripling or quadrupling of a federal sentence of incarcera-
tion), to the category of a mere decision "pertaining to the
conduct of the trial." *Hill*, 528 U.S. at 115.

This grievous miscalculation is a decision that I cannot
join. Rather, given the extraordinary consequences for the
defendant, I would hold that the plain language of the *Shep-
ard* guarantee, in light of the context in which the Supreme
Court used that language, means that the *Shepard* guarantee
is best recognized as a form of protection for a defendant
which rises to the level of a "basic right[ ] that the attorney
cannot waive without the fully informed and publicly
acknowledged consent of the client." *Id.*

The Supreme Court did not intend that the term "*Shepard*-
approved document" would become talismanic. To the con-
trary, it matters what is contained in, and revealed by, such a
document. When the *Shepard*-approved document is a tran-
script of a guilty plea colloquy, I believe the Court meant
what it said when it described a "transcript of [the] colloquy
between judge and defendant in which the factual basis for the
plea was confirmed by the defendant." Specifically, the Court
has instructed lower federal courts to rely on "*the defendant's
own admissions*." *Shepard*, 544 U.S. at 25 (emphasis added).
The majority's refusal to adhere to that command is error.[6]

(Text continued on page 25)

---

[6]In response to this partial dissent, the majority has suggested in a foot-
note that immediately after Thompson's attorney told the state court judge
that she had "no additions or corrections to make," "Thompson *then* stated
he had nothing to add." Maj. Op. at 16 n. *. (emphasis added) In fact,
however, the portion of the transcript of the guilty plea proceedings
referred to by the majority plainly shows that Thompson most assuredly
did not make the statement attributed to him by the majority immediately
after his lawyer's disclaimer. Rather, the record shows that the state court
judge had proceeded to the sentencing phase of the hearing and that, when
Thompson was invited to exercise his right of allocution, he simply

declined. The transcript of the colloquy among the judge, the defense attorney ("Ms. Shapiro") and the prosecutor ("Mr. McDaniel") reads as follows immediately after the state's proffer:

THE COURT: Any additions or corrections?

MS. SHAPIRO: No, Your Honor.

THE COURT: Based on that statement of facts, Mr. Thompson, I find you guilty of wear, carrying and transporting and assaulting Officer Geolamas. All right. With regards to sentencing, Mr. McDaniel?

MR. MCDANIEL: Your Honor, State would submit on the conversations at the bench.

THE COURT: Miss Shapiro?

MS. SHAPIRO: I would submit as well. Mr. Thompson, is there anything that you would like to say to the judge –-

THE COURT: Well, before he says anything, have you prepared the sentencing guideline sheet, Mr. McDaniel?

MR. MCDANIEL: Yes, Your Honor.

THE COURT: And have you shown it to Miss Shapiro?

MR. MCDANIEL: Here you are.

THE COURT: Miss Shapiro, is that correct?

MS. SHAPIRO: Yes, Your Honor.

THE COURT: And completely filled out?

MS. SHAPIRO: Yes, Your Honor.

THE COURT: Then, I assume, Mr. McDaniel, you filled it out correctly to the best of your knowledge?

MR. MCDANIEL: To the best of my knowledge, Your Honor.

THE COURT: All right. Would you please submit it to the clerk. All right. Now, would you advise your client of his right of allocution.

MS. SHAPIRO: Mr. Thompson, is there anything that you would like to say to the judge? I have spoken on your behalf this morning. You have an opportunity to speak if you'd like to or you can remain silent. Is there anything else you'd like to say?

Respectfully, therefore, I dissent from the affirmance of the judgment as to Appellant Thompson. I would vacate his sentence and remand for resentencing.

---

THE DEFENDANT: No, ma'am.

THE COURT: All right.

J.A. at 639-40.

I do respect the contrary views of my good colleagues in the majority as to what the law requires in this case; our difference is one born of an earnest and studied effort by all to apply the law faithfully. No less so than judicial hostility (seen in some quarters) to the vagaries of the Supreme Court's sentencing jurisprudence under the Armed Career Criminal Act, judicial disagreements over the appropriate interpretation and application of the principles the Court has enunciated are entirely understandable. In the end, only the Supreme Court itself can provide the clarification so urgently needed. In that spirit, I would suggest that Thompson's counsel (who has ably represented his client upon appointment by this court) save the taxpayers a few dollars and forego the customary petition for rehearing in this case and seek *certiorari* without inordinate delay.